FILED

17 OCT 11 AM 9: 03

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: *RMC* DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE GONZALEZ, JR., | Case No.: 15cv1882-H-KSC |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |
| SCOTT KERNAN, Secretary, | |
| Respondent. | |

Jesse Gonzalez, Jr. (hereinafter "Petitioner") is a state prisoner proceeding pro se and in forma pauperis with a First Amended Petition for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. (ECF No. 28.) Petitioner was convicted of willful, deliberate and premeditated attempted murder with the use of a deadly weapon and infliction of great bodily injury causing permanent paralysis, and assault with a deadly weapon with infliction of great bodily injury causing permanent paralysis, for which he was sentenced to life in prison with the possibility of parole plus six years. (Id. at 1-2.) He claims his federal constitutional rights were violated because there is insufficient evidence of deliberation and premeditation (claim one), he received ineffective assistance of counsel (claims two and four through eight), the jury was not allowed to view video exhibits in the jury room during deliberations (claim three), and he was denied access to the courts because his state habeas petitions were erroneously denied as untimely (claim nine). (Id. at 9-56.)

1    Respondent has filed an Answer and lodged portions of the state court record. (ECF

2    Nos. 16, 37-38.) Respondent argues that the adjudication by the state court of claims one

3    through three, which were raised by appointed counsel on direct appeal, is neither contrary

4    to, nor involves an unreasonable application of, clearly established federal law. (EFC No.

5    37-1 at 11-17.) Respondent contends that claims four through eight, which were raised on

6    state habeas by Petitioner proceeding pro se, are procedurally defaulted because the state

7    court found them to be untimely, and that claim nine is meritless. (Id. at 17-19.)

8    Respondent also argues that an evidentiary hearing is unwarranted. (ECF No. 37 at 3.)

9    Petitioner has filed a Traverse. (ECF No. 50.) He argues that claims four through

10   eight are not procedurally defaulted because, although the state trial and appellate courts

11   found them to be untimely, they were not found to be untimely by the state supreme court.

12   (Id. at 3.) He contends the state court adjudication of his claims is contrary to, and an

13   unreasonable application of, clearly established federal law, and that an evidentiary hearing

14   is warranted. (Id. at 3-26.) He has also filed several motions, which the Court denied as

15   premature and without prejudice to consideration of the arguments in this Report, in which

16   he argues that any default can be excused and the record should be expanded to include

17   additional portions of the state court record. (ECF Nos. 54, 56, 57, 60, 61.)

18   For the following reasons, the Court finds claims four through eight are procedurally

19   defaulted, but that judicial economy counsels in favor of addressing the merits of the claims

20   without determining whether Petitioner could overcome the default because they clearly

21   fail on their merits. The Court finds that the state court adjudication of all claims presented

22   in this action is neither contrary to, nor involves an unreasonable application of, clearly

23   established federal law, and is not based on an unreasonable determination of the facts.

24   The Court also finds an evidentiary hearing is neither necessary nor warranted, and

25   recommends the Petition be denied.

26   **I.   PROCEDURAL BACKGROUND**

27   In a two-count Third Amended Information filed in the Imperial County Superior

28   Court on July 24, 2012, Petitioner was charged with attempted willful, deliberate and

premeditated murder in violation of California Penal Code §§ 187(a) and 664 (count one), and assault with a deadly weapon in violation of Penal Code § 245(a)(1) (count two). (Lodgment No. 1, Clerk's Transcript ["CT"] at 269-72.) As to count one it was alleged that Petitioner personally used a deadly weapon (a knife) and personally inflicted great bodily injury which resulted in paralysis within the meaning of Penal Code §§ 12022(b)(1) & 12022.7(a)-(b). (Id.) As to count two it was alleged that Petitioner personally inflicted great bodily injury which caused the victim to become comatose and suffer paralysis within the meaning of Penal Code §§ 12022.7(a)-(b). (Id.)

On July 27, 2012, a jury found Petitioner guilty on both counts and returned true findings on all the allegations. (CT 331-34.) On March 7, 2013, he was sentenced to life in prison with the possibility of parole on count one, plus consecutive terms of five years for the great bodily injury finding and one year for the deadly weapon finding, and had his sentence on count two stayed. (Lodgment No. 1-A, Clerk's Augmented Tr. at 5-8.)

Petitioner appealed, raising claims one through three presented here. (Lodgment No. 3.) The appellate court affirmed. (Lodgment No. 5, People v. Gonzalez, No. D063129, slip op. (Cal.App.Ct. Feb. 26, 2014).) On March 24, 2014, Petitioner filed a petition for review in the state supreme court raising claims one through three here. (Lodgment No. 6.) That petition was denied with an order which stated: "The petition for review is denied." (Lodgment No. 7, People v. Gonzalez, No. S217429 (Cal. May 14, 2014).)

On August 3, 2015, Petitioner filed a habeas petition in the state superior court in which he raised claims four through eight presented here. (Lodgment No. 8.) On August 10, 2015, he constructively filed his original habeas petition in this Court which contained claims one through three, accompanied by a motion to stay this action while he exhausted state court remedies as to the remaining claims. (ECF Nos. 1-2.) On September 8, 2015, the state superior court denied Petitioner's habeas petition on the basis that he had failed to use the proper form, failed to explain why his petition was over a year late, and failed to explain why his claims were not raised at trial or on appeal. (Lodgment No. 9, In re Gonzalez, No. EHC01959, order (Cal.Sup.Ct. Sept. 8, 2015).)

On February 18, 2016, Petitioner filed a habeas petition in the state appellate court in which he raised the same claims presented in the trial court habeas petition, plus claim nine raised here. (Lodgment No. 10.) The appellate court denied the petition on the basis that it was untimely because it was filed over three years after sentencing without any explanation for the delay, and, alternately, on the merits of the claims. (Lodgment No. 11, In re Gonzalez, No. D069783, order (Cal.App.Ct. Feb. 26, 2016).)

On March 21, 2016, Petitioner filed a habeas petition in the state supreme court in which he raised claims four through nine presented here. (Lodgment No. 12.) That petition was denied on June 8, 2016, with an order which stated: "Petition for writ of habeas corpus denied." (Lodgment No. 13, In re Gonzalez, No. S233162, order (Cal. June 8, 2016).)

On June 13, 2016, this Court denied as moot Petitioner's motion for stay and abeyance because he had completed exhaustion of his state court remedies while the motion was pending. (ECF No. 27.) Petitioner filed his First Amended Petition, the operative pleading in this action, on June 20, 2016. (ECF No. 28.) He thereafter filed a motion for opposition to any default, and motions to expand the record and lodge additional portions of the state court record. (ECF Nos. 54, 56, 57, 60.) On July 27, 2017, the Court denied the motions as premature, indicating that the arguments and requests made in those motions would be addressed in this Report, which the Court does below. (ECF No. 61.)

## II. TRIAL PROCEEDINGS

Lance Hicks testified that he is the owner of the Hard Luck Tavern in El Centro, California. (Lodgment No. 2, Reporter's Tr. ["RT"] at 153-54.) He was working there on Christmas day, 2010, when, around closing time, about 2:00 a.m., three men, one of whom he identified in court as Petitioner, entered the tavern, briefly spoke to Hicks' wife, and left without incident. (RT 154-56, 160-61.) A few minutes later the back door blew open and a concrete boulder used to hold the door open tumbled in. (RT 156.) Hicks picked up the boulder, walked outside and encountered the three men who had just left through the front door. (RT 156-57.) He asked them: "Why Christmas? Why throw the boulder?" (RT 157.) Hicks said Petitioner then ran at him very fast, crouched down running low, and

Hicks "felt very threatened, very scared," and felt the need to defend himself. (RT 158.) Hicks said that Petitioner hugged him and in the process must have stabbed him in the back, as Hicks said he felt dead and felt his legs disappear. (RT 158-59.) He said his head slammed to the ground, and he remembered being unable to defend himself, holding his hand up, and pleading for Petitioner to stop the attack. (RT 160.) The only other thing he remembered was his wife slapping his face and telling him to be strong and stay awake while several people were standing over him, and passing out just before he told her he was dying. (RT 161.) He thought he had died, but woke up several days later in a hospital with fifteen stab wounds, including one in his back, two in his neck, two in his chest, one in his heart, three in his lungs, and several defensive wounds to his arms. (RT 161-62.)

Dorian Gray testified that he was working as a bartender at the Hard Luck Tavern on Christmas day 2010. (RT 176.) A few minutes after the bar closed at 2:00 a.m., Gray was cleaning up and counting the receipts when his neighbor, Louis Murillo, entered with Petitioner and another man. (RT 177, 183.) Murillo waived to Gray and said: "That's my neighbor." (RT 178.) Ana Hicks, the owner's wife, met them at the door, told them they were closed, asked them to leave, and the men left. (Id.) About two minutes later, Gray heard a loud noise at the back door, went to see what it was, and saw the owner, Lance Hicks, by the door, who told Gray to go back to washing the dishes. (RT 179.) Gray went back to the dishes, and "maybe a minute" later heard a commotion outside. (RT 180.) He grabbed a stun gun from behind the bar and ran out the back door. (Id.) Gray saw Hicks laying on the ground on his back holding a hand out with Petitioner kneeling on his midsection. (RT 181.) Petitioner appeared to be punching Hicks with numerous fast punches. (Id.) As Gray approached, Petitioner looked straight at him, while Murillo stood about twenty feet away, and the third man who had been refused service stood about fifteen feet away. (RT 182.) Murillo said: "Let's go," as Gray ran toward Hicks and Petitioner while firing the stun gun into the air twice, which made a loud popping noise. (RT 182-83, 208.) At that point Gray saw a knife in Petitioner's hand, saw that Petitioner was stabbing Hicks not punching him, and saw blood on Petitioner's hand and all over Hicks.

5

(RT 184.) Gray touched Petitioner with the stun gun and activated it, but it did not seem to have any effect. (RT 184-85.) The third man grabbed Petitioner by the back of his shirt and pulled Petitioner off Hicks, away from Gray, and the three men ran away. (RT 185.) Gray began to run after them, but Hicks asked for help, so Gray returned and tried but could not help him up. (RT 185-86.) Hicks asked Gray to get his wife, so Gray ran to the back door and yelled for help, and a man named Bostic arrived and rendered first aid. (RT 186-87.) Gray said he saw Petitioner stab Hicks at least nine to ten times, and that Petitioner was already stabbing Hicks when Gray first came outside. (RT 188.)

Justin Bostic testified that he is a Senior Deputy Sheriff with the Imperial County Sheriff's office. (RT 211.) He was off duty standing in front of the Hard Luck Tavern about 2:00 a.m. on December 26, 2010, when he was approached in an aggressive manner by three men who "were walking as if they owned the sidewalk," and "told me to give them a cigarette instead of asking for one." (RT 212-13.) Bostic told them he did not have a cigarette, pointed at a passing car and told them he had just gotten one from that car, which was untrue but he thought the car would be gone before they could contact it and it would get the men away from him. (RT 213-14.) The three men then ran into the street and started banging on the car windows requesting a cigarette. (RT 214.) They appeared to know the people in the car, and after the two groups spoke briefly, the three men entered the Hard Luck Tavern. (Id.) They came back out almost immediately, walked over to the opening of an alley between the tavern and the next building which was blocked by a chain link fence, and pulled down the fence. (Id.) Bostic stayed in front of the tavern talking to his family and friends as the three men walked into the alley. (RT 216.) About three to five minutes later, Bostic heard screaming from behind the tavern and ran in the direction the three men had gone. (Id.) Behind the tavern he saw a man lying on the ground moaning and groaning with one or two women next to him, and he put pressure on the man's wounds and attempted to keep him awake. (RT 217-20.)

Steven Gonzalez, an emergency medical technician, testified that he and his paramedic partner responded to the rear of the Hard Luck Tavern about 2:30 a.m. on the

15cv1882-H-KSC

| 1 | night of December 25, 2010. (RT 247.) He treated a victim for multiple stab wounds, |
| 2 | placed him in a cervical collar and on a spinal board, and administered fluids intravenously |
| 3 | due to the blood loss. (RT 248-49.) He drove the victim to the hospital where air was |
| 4 | pumped into his chest due to a collapsed lung. (RT 249-50.) The parties stipulated that if |
| 5 | called, Dr. Veerinder Anand, an orthopedic surgeon, would testify that he treated the |
| 6 | injuries sustained by Hicks, which included a stab wound to the thoracic spine which |
| 7 | caused Hicks to become a paraplegic for the rest of his life. (RT 251-52.) |

Richard Ramos, an El Centro Police Detective, testified that Petitioner was arrested on December 30, 2010, after he drove by his residence while a search warrant was being executed. (RT 253-54.) A video taken by a surveillance camera from a restaurant next door to the Hard Luck Tavern was played for the jury, and the People rested. (RT 299-302.) The appellate court described the video:

> That video shows a paved area in the foreground and walls and parked cars in the background. Three people are seen running in the background, from left to right, one after the other. Almost immediately, a fourth person follows at a slower pace. A person comes into view on the right and moves toward the fourth person. The fourth person moves back slightly, stretches an arm toward the other person and moves his foot in a kicking motion, but does not touch the other person. The other person moves toward the fourth person, the fourth person reciprocates, and they make contact. Standing close together, they move toward the left and out of view, as the other person hits the fourth person repeatedly. More people appear. There is a flash. Emergency vehicles arrive.

(Lodgment No. 5, People v. Gonzalez, No. D063129, slip op. at 8.)

The defense called Ramon Bonesi, who testified that on December 25, 2010, he was in El Centro visiting his family. (RT 318.) He decided to visit Petitioner, a friend he had known since the second grade, and walked to Petitioner's house carrying an 18-pack of beer, arriving about 5:30 p.m. (RT 319-20, 341.) Bonesi said he eventually went out for more beer and brought Luis Murillo back to Petitioner's house where the three of them continued drinking beer. (RT 320-21.) They decided to go to a bar about 10:00 p.m., and took some beer with them as they walked to the Owl bar. (RT 321-22.) At the Owl bar

they drank about six pitchers of beer between them, along with three shots each of hard liquor. (RT 330, 333.) Bonesi started feeling unwell about 12:30 p.m. due to the large amount of alcohol he had consumed. (RT 323.) He took a taxi home, where he showered and ate, and returned to the Owl bar about an hour later, where Petitioner and Murillo were still drinking. (RT 324-25.) He said Petitioner and Murillo had not noticed he had been gone, and the three of them continued drinking until the bar closed. (RT 325.)

Bonesi said he was "pretty drunk" when the three of them left the Owl bar about 2:00 a.m. and walked to the Hard Luck Tavern. (RT 326.) He did not recall meeting anyone outside the tavern, did not recall asking for a cigarette, said he did not smoke cigarettes although Murillo did, and did not recall stopping a vehicle in front of the tavern. (RT 326-27.) Immediately after they entered the tavern a woman told them it was closed, so they left and started to walk home. (RT 328.) They stepped into an alley over a fence that had been knocked down, but he did not remember if they knocked it down. (RT 329.) The next thing he remembered the three of them had turned around and were running. (RT 330.) When he noticed that Petitioner was not with them, he went back and saw Petitioner in a scuffle with another man. (RT 331.) Bonesi testified that he went to pull Petitioner off the man, and tapped Petitioner on the shoulder, but just as he was about to grab Petitioner, and while Gray was coming at them making a noise with a taser, Petitioner disengaged from the fight by himself. (RT 337-38.)

On cross-examination, Bonesi admitted he lied when he gave several versions of his story to the police, saying at first he did not remember anything and then changing his story to running away right after Petitioner threw a rock through the back door. (RT 334-35.) Bonesi agreed that the surveillance video from the restaurant next door showed Petitioner and Hicks fighting just before they disappeared from view as they fell to the ground behind a car. (RT 338-39.) He identified himself as the man on the video who, about ten seconds later, runs into the scene, gets down behind the car, and then stands up and throws Petitioner ahead of him just before they run away. (Id.) He said the three of them then ran back to Petitioner's house, where he asked Petitioner how he got a cut on his arm, and Petitioner

admitted he had stabbed someone during the fight. (RT 339-40.) Bonesi said that when he and Petitioner were in a jail cell together later, they asked each other what had happened, and Petitioner said he had blacked out and could not remember the incident, although Petitioner remembered meeting up at his house afterwards. (RT 347-48.)

Petitioner testified that he lived with his family in El Centro in 2010, and that he spent Christmas Eve at home where he drank beer, smoked marijuana, and took the drug Ecstasy. (RT 455-56.) He awoke about 10:00 a.m. the next day with a hangover, and drank beer and smoked marijuana with his breakfast. (RT 457.) His friend Ramon Bonesi came to his house between 4:00 and 5:00 p.m. that day, and they drank the 18-pack of beer Bonesi brought with him, along with some leftover beer from the night before, and smoked marijuana. (RT 458-60.) At some point Petitioner's father drove them to pick up their friend Luis Murillo, and they brought him back to Petitioner's house. (RT 460.) Petitioner said it was possible they went to get Murillo because they ran out of beer, but he could not remember. (RT 460-61.)

The three of them continued drinking beer and smoking marijuana at Petitioner's house until they walked to the Owl bar. (RT 461-63.) Petitioner was carrying a non-folding knife with a blade four or five inches long in a sheath in his pocket. (RT 464.) He had been carrying the knife for a couple of years, which he used at work and around the house, and "had become used to carrying it around." (RT 464-65.) He said he drank about 20 beers before walking to the Owl, and did not remember walking there or arriving. (RT 465.) He remembered being at the Owl and drinking at least two pitchers of beer and two or three shots of tequila. (RT 467-68.) He did not remember Bonesi leaving for an hour, but remembered leaving the Owl and not being allowed back in, and remembered then going to the Conga bar down the street and drinking beer. (RT 468-70.)

The next thing he could remember was the three of them passing the Hard Luck Tavern on their way home, and being denied entrance. (RT 470.) He did not remember encountering anyone in front of the tavern or stopping a vehicle, and said neither he, Bonesi nor Murillo smoke cigarettes. (RT 471-72.) As they cut through a gap between buildings,

he saw a big rock and thought it would be funny to throw it at the door. (RT 471-74.) He threw the rock and they ran. (RT 474.) Petitioner could not remember why he walked back, and the next thing he remembered was a man, who he found out later had come from the Hard Luck Tavern and was named Hicks, was standing in front of him. (RT 475-76.) Hicks was very angry, was yelling, and called Petitioner a motherfucker. (RT 476.) Before Petitioner had thrown any punches or taken out his knife, he was hit and kicked a couple of times in the head by Hicks. (RT 477.) As Hicks began to hit Petitioner, he noticed a large man, who he later found out was Gray, standing behind Hicks with a weapon in his hand. (RT 476.) Gray was coming closer with the weapon, so Petitioner took out his knife and stabbed Hicks once in the abdomen. (RT 477-78.) Petitioner thought Hicks must have continued to hit him, but he could only remember being on top of Hicks, who was holding Petitioner by his shirt collar. (RT 479.) He did not remember stabbing Hicks fourteen times, but remembered being scared that he "was going to get seriously hurt by these two bigger men, one who I thought had a weapon." (RT 480.) When he "came back to [his] senses," he pushed himself off Hicks and ran. (Id.) He ran home where he met Bonesi and Murillo, and told them he had stabbed a man. (RT 481-82.) He threw the knife away as he ran home, and threw his bloody clothes away the next day. (RT 482-83.)

On cross-examination Petitioner admitted he told a defense psychiatrist named Dr. Greene that he had a lot of problems with anger for many years, that he had a really bad temper, got mad easily, and had gotten into quite a few fights in his life. (RT 486-88.) He also told Dr. Greene that he smoked about half a gram of methamphetamine each day in the month leading up to Christmas. (RT 490-91.) He testified that he "can't really explain" why he was able to remember things that show he "did nothing wrong," such as what, where and how much he drank, being physically and verbally attacked by Hicks, feeling threatened by Gray, feeling scared and thinking he was going to get seriously hurt by the two bigger men, and running away, but could not remember things "which would go to the intent to kill," such as why he turned back to confront Hicks, running at Hicks, stabbing him fifteen times, and how he got up or got off Hicks. (RT 518-19.)

Doctor John Greene, a psychiatrist, testified that he interviewed Petitioner for about four hours on June 13, 2012, and administered three different tests to determine if he was being truthful. (RT 548-51.) Petitioner's answers were consistent with people who do not fake mental illness, and Dr. Greene opined that he was most likely telling the truth. (RT 551.) Petitioner reported past use of methamphetamine, alcohol and marijuana, and said he was intoxicated on alcohol during the crime, as he and his two friends drank approximately 90 beers that day along with several shots of hard liquor, which Dr. Greene opined would have caused memory loss and impaired judgment. (RT 555-61.) Petitioner also reported anger problems as a child, that he had been expelled from school, taken to juvenile hall, and placed on probation, but told Dr. Greene that his anger issues had lessened as an adult. (RT 562.) Dr. Greene said Petitioner's records indicate he was diagnosed with adjustment disorder in 2001, when he was thirteen years old, perhaps related to his parents' divorce, but by the time he was age seventeen there were no longer any reported behavioral issues. (RT 562-64.)

The defense played a surveillance video taken inside the Hard Luck Tavern about 2:10 a.m., and rested. (RT 618-20.) The appellate court described that video:

> A video taken inside the Hard Luck Tavern depicts three men entering through the front door. A blond woman moves toward them, gesturing and pushing one of them in the direction of the door. One of the men also gestures. The three men leave. A man, apparently Hicks, approaches the door after the men are outside. Within a minute, he looks toward the back door of the tavern, moves toward the back door and disappears from view. Within seconds, another man, apparently Gray, follows him quickly, holding an object, apparently the stun gun, and also disappears from view. Approximately one minute later, the blond woman, a brunette woman and a man run toward the back of the tavern and disappear from view. Within seconds, the brunette woman comes into view, running from the back door area toward the front of the tavern.

(Lodgment No. 5, People v. Gonzalez, No. D063129, slip op. at 7-8.)

The prosecutor argued in closing that the video taken from the restaurant next door, although of poor quality, showed Petitioner and his two friends running away, then Hicks

11

15cv1882-H-KSC

coming into the picture and stopping, and Petitioner running back at Hicks. (RT 681-82.)
Petitioner is seen pausing briefly when he reaches Hicks, Hicks throws a kick and a punch
at Petitioner, they separate for a fraction of a second and then come together. (RT 682.)
For a second and a half, four punches and a kick are seen and Hicks goes to the ground
with Petitioner on top of him as they both disappear behind a parked car for about 10 or 11
seconds. (Id.) Bonesi is then seen walking up to where Hicks and Petitioner disappeared,
reaching down and picking up Petitioner, and they both run away. (Id.) Gray then steps
into the picture holding a flashing stun gun. (Id.)

Defense counsel argued in closing that the video from inside the tavern showed Gray
following Hicks out the back door with the taser in his hand just seconds after Hicks went
outside, not about a minute later as Gray testified. (RT 709-10.) Defense counsel argued
that the video taken from the restaurant next door did not show Petitioner crouching and
running at Hicks as Hicks testified, and did not show a knife in Petitioner's hand. (RT
711.) Rather, he argued it shows Hicks kick Petitioner in the groin, and then kick Petitioner
once and hit him twice while Petitioner is hitting back before they fall out of sight, and
shows nothing after that. (RT 712-13.) Defense counsel argued that Petitioner was too
intoxicated to form the intent to kill, or to premeditate or deliberate the attack, that he acted
in self-defense because he reasonably believed he was in imminent danger and reasonably
believed the use of force was necessary to defend himself, or acted in imperfect self-
defense if those beliefs were unreasonable, and that at most he was guilty of attempted
voluntary manslaughter because he acted under the heat of passion after being provoked
by what Hicks said and by Hicks starting the fight. (RT 706-21.)

Immediately after deliberations began, the jury sent a note requesting to have the
videos brought to the jury room to view "privately (without audience) to discuss among
ourselves." (CT 321.) They were only allowed to view the videos in open court because
they were on the prosecutor's laptop computer which contained other material. (RT 738-
43.) The videos were played three times in open court, and the jurors were admonished
not to discuss what they were seeing or make any comments while they were viewing them.

15cv1882-H-KSC

1  (Id.) The jury thereafter requested the video from the restaurant next door be played frame
2  by frame, but were told it could not be viewed in that manner, so it was played twice at
3  one-quarter speed and twice at half speed. (RT 743-45.) The jury then submitted a request
4  that it be played three times at half speed and one-quarter speed, and later another request
5  that it be played three times at full speed, twice at half speed, and once at one-quarter speed.
6  (CT 321-26.)  After deliberating about ten hours over two days, the jury found Petitioner
7  guilty of willful, deliberate and premeditated attempted murder, guilty of assault with a
8  deadly weapon, and found that he had personally used a deadly weapon and had inflicted
9  great bodily injury resulting in permanent paralysis. (CT 280-81, 321-28.) Petitioner was
10 sentenced to life in prison with the possibility of parole plus six years on the attempted
11 murder count, and to three years on the assault with a deadly weapon count which was
12 stayed. (Lodgment No. 1-A, Clerk's Augmented Tr. at 5-8.)

13 **III.  DISCUSSION**

14      Petitioner claims his federal constitutional rights were violated because: (1) there is
15 insufficient evidence to support the jury finding that the attempted murder was committed
16 with premeditation and deliberation, as the evidence showed he stabbed the victim in a rash
17 and impulsive act while severely intoxicated (claim one); (2) he received ineffective
18 assistance of trial counsel in failing to request the jury be instructed that provocation can
19 negate premeditation and deliberation (claim two); (3) he was denied his right to a jury trial
20 and a fair trial by refusing to allow the jury to view the videos in the jury room, which
21 prevented meaningful deliberations (claim three); (4) his statements to Dr. Greene were
22 inadmissible because they were obtained without Miranda warnings (claim four); (5) he
23 received ineffective assistance of trial counsel due to counsel's failure to seek exclusion of
24 his statements to Dr. Greene on the basis they were obtained without Miranda warnings
25 (claim five); (6) he received ineffective assistance of trial counsel due to counsel's failure
26 to object to the prosecutor's repeated statements that Bonesi pulled Petitioner off the victim
27 (claim six); (7) he received ineffective assistance of counsel due to trial counsel's failure
28 to request the jury be instructed on voluntary intoxication causing unconsciousness (claim

13

seven); (8) he received ineffective assistance of appellate counsel in failing to raise claims four through seven on appeal (claim eight); and (9) he was denied access to the courts when the state trial and appellate courts erroneously denied his habeas petitions as untimely. (ECF No. 28 at 9-56.)

Respondent answers that the state court adjudication of claims one through three is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and claim three does not present a federal issue. (ECF No. 37-1 at 11-17.) Respondent contends claims four through eight are procedurally defaulted because the state court denied them as untimely, and claim nine lacks merit. (Id. at 17-19.)

Petitioner replies that claims four through eight are not procedurally defaulted because the state supreme court did not find them untimely, and argues that in any case he can excuse any default. (ECF No. 50 at 3; ECF No. 56 at 4-21.) He argues that the state court adjudication of all of his claims is contrary to, and an unreasonable application of, clearly established federal law, and that an evidentiary hearing is warranted. (ECF No. 50 at 3-26.) He also requests expansion of the record to include the videos introduced at trial, as well as portions of the Reporter's Transcript not lodged by Respondent involving argument on pre-trial motions: (a) to preclude Bonesi from testifying that the reason he pulled Petitioner off Hicks during the fight was to prevent him from being tased by Gray, and (b) ruling inadmissible Dr. Greene's opinion that Petitioner did not form the intent to kill and did not premeditate or deliberate because he was intoxicated. (ECF No. 54 at 1-2; ECF No. 57-1 at 1-12; ECF No. 59 at 1-3.)

A.    **Standard of Review**

In order to obtain federal habeas relief with respect to a claim adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C.A. § 2254(d) (West 2006). Even if § 2254(d) is satisfied, a petitioner must show a federal constitutional violation occurred in order to obtain relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). In order to satisfy § 2254(d)(2), the petitioner must show that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

## B.    Claim One

Petitioner alleges in claim one that his Fourteenth Amendment right to due process was violated because there is insufficient evidence to support the finding of premeditation and deliberation by the jury. (ECF No. 28 at 9.) He argues that the evidence showed he threw a rock at the tavern door and was running away when Hicks drew him back by yelling obscenities, and that Hicks started the fight. (Id. at 9-10.) Thus, he argues, the evidence at best shows that, while extremely intoxicated, he stabbed Hicks in a rash and impulsive act without careful consideration of that choice or its consequences, and only after Hicks had insulted, punched and kicked Petitioner while Gray was standing behind Hicks with a weapon. (Id.) Respondent answers that the state court denial of this claim, on the basis

that sufficient evidence was presented to allow the jury to draw a reasonable inference that Petitioner considered the circumstances and, after reflection, decided to kill Hicks, is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (ECF No. 37-1 at 11-12.)

Petitioner presented this claim to the state supreme court in his petition for review. (Lodgment No. 6.) That petition was denied with an order which stated: "The petition for review is denied." (Lodgment No. 7.) The same claim was presented to the state appellate court on direct appeal. (Lodgment No. 3.) The appellate court denied the claim in a written opinion. (Lodgment No. 5.)

There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991). The Court will look through the silent denial of this claim by the state supreme court on direct appeal to the last reasoned state court opinion addressing the claim, the appellate court opinion on direct appeal, which stated:

> Gonzalez contends his intoxication and Hicks's provocation (cursing at him after he had begun running away, then kicking and punching him) precluded a finding of attempted murder with premeditation and deliberation.

> Attempted "willful, deliberate, and premeditated murder . . . shall be punished by imprisonment in the state prison for life with the possibility of parole. . . . The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (§ 664, subd. (a).) Willfulness refers to an intent to kill. (See *People v. Concha* (2009) 47 Cal.4th 653, 666.) "'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. (Citations.) 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." (Citations.)' (Citation.)" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

16

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (Citations.) On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (Citation.)'" (Citations.) (¶) "'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. (Citation.) Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. (Citations.)" (Citation.)' (Citation.)" (*People v. Smith* (2005) 37 Cal.4th 733, 738–739.)

A rational jury could have accepted Hicks's version of events and rejected Gonzalez's version. The evidence set forth above, including Hicks's and Gray's testimony, would allow a reasonable jury to conclude that in a short period of time, before he attacked Hicks, Gonzalez considered the circumstances and, after reflection, decided to kill Hicks. Substantial evidence supports the finding of deliberation and premeditation and the conviction of attempted murder.

(Lodgment No. 5, <u>People v. Gonzalez</u>, No. D063129, slip op. at 8-11.)

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979). The Court must apply an additional layer of deference in applying the <u>Jackson</u> standard, and "must ask whether the decision of the California Court of Appeal reflected an 'unreasonable application of' <u>Jackson</u> and <u>Winship</u> to the facts of this case." <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005), quoting 28 U.S.C. § 2254(d)(1). Federal habeas relief functions as a "guard against extreme malfunctions in the state

criminal justice systems," not as a means of error correction. <u>Richter</u>, 562 U.S. at 103, quoting <u>Jackson</u>, 443 U.S. at 332 n.5.

Petitioner's jury was instructed that:

> The defendant acted willfully if he intended to kill when he acted. A defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant premeditated if he decided to kill before acting.

> The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and in accordance to the circumstances. A decision to kill made irrationally, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated.

> On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

(RT 657-58.)

Hicks testified that when he walked out the back door of the tavern: "There were three gentlemen, three kids," about fifteen or twenty feet away, and that he said to them: "Why Christmas? Why throw the boulder?," although he admitted: "I don't exactly remember to this day exactly what I said." (RT 157-58.) He testified that Petitioner turned around and then . . . came running at me," and "ran at me very fast, kind of crouched down and low like he was coming at me. I'm old enough to know when somebody is coming at you." (RT 158.) Hicks said: "I felt very threatened, very scared. And it felt like I needed to defend myself." (<u>Id.</u>) He described what he felt when Petitioner made contact:

> I'll never forget it. You feel like you are dead because he kind of hugged me and then he stabbed me in my back apparently. I didn't know it then. You feel your legs kind of just disappear. At that moment I forgot about what I was doing, where I was, the scene I was at. I felt more like I was dead. I didn't feel like I was there anymore.

(RT 159.)

The video from the restaurant next door, as described by the appellate court, shows Petitioner initially running away from the back of the tavern but then moving back towards Hicks when Hicks enters the picture. (Lodgment No. 5, <u>People v. Gonzalez</u>, No. D063129, slip op. at 8.) Hicks is seen retreating slightly as Petitioner approaches, and stretches his arm towards Petitioner and tries but fails to kick him. (<u>Id.</u>) Petitioner is then seen moving forward and making contact with Hicks, and, while standing close together, they move toward the left and out of view as Petitioner hits Hicks repeatedly. (<u>Id.</u>)

The jury could draw a reasonable inference from that evidence that Petitioner ran away after throwing the rock, came back when Hicks said something to his group, and, while Hicks was backing off and trying to defend himself, Petitioner stabbed Hicks almost immediately. The jury could draw a reasonable inference under their instructions that as Petitioner approached Hicks he armed himself with his knife, "carefully weighed the considerations for and against his choice and, knowing the consequences," made a quick "cold, calculated decision to kill." (RT 657-58.)

Petitioner argues the evidence showed his decision to kill was made irrationally, impulsively, or without careful consideration of the choice and its consequences, and therefore was not deliberate and premeditated. He argues the jury could have drawn such an inference if they believed: (a) he was severely intoxicated, that is, if they believed his testimony regarding the amount of alcohol he consumed (which was supported only by the testimony of Bonesi, his close friend who admitted he repeatedly lied to the police about the incident), (b) his testimony that Gray was standing behind Hicks with a weapon in his hand as Hicks initiated an attack on Petitioner (which the parties disputed was supported by the video evidence), and (c) his testimony that only then did he take out his knife because he was afraid the two large men could seriously hurt him, and could only remember stabbing Hicks once in the stomach. Even assuming such an inference is reasonable, the jury obviously did not draw that inference. The jury was instructed to consider the veracity of the witnesses, which, with respect to Petitioner, included his testimony that he "can't really explain" why he was able to remember things that show he "did nothing wrong,"

1   such as what, where and how much he had to drink, being physically and verbally attacked

2   by Hicks, feeling threatened by Gray, thinking he was going to get seriously hurt by the

3   two bigger men, stabbing Hicks only once, and feeling scared and running away, but could

4   not remember things "which would go to the intent to kill," such as why he turned back to

5   confront Hicks, running at Hicks, stabbing him an additional fourteen times, and how he

6   got up or got off Hicks. (RT 518-19.) The jury could have drawn a reasonable inference

7   that the testimony regarding the enormous quantity of alcohol Petitioner consumed was not

8   entirely consistent with his selective memory or his actions. Any contention that the jury

9   should have believed his testimony and the testimony of his good friend Bonesi rather than

10  Hicks and Gray does not support federal habeas relief. See Schlup v. Delo, 513 U.S. 298,

11  330 (1995) ("under Jackson, the assessment of the credibility of witnesses is generally

12  beyond the scope of review."); see also Coleman v. Johnson, 566 U.S. 650, ___, 132 S.Ct.

13  2060, 2065 (2012) ("The jury in this case was convinced, and the only question under

14  Jackson is whether that finding was so insupportable as to fall below the threshold of bare

15  rationality.")

16      Petitioner requests the Court expand the record to include the videos because he

17  "believes they are important so that this court can have a full concept for the case and

18  claims currently under revision." (ECF No. 57 at 2.) However, the Court need not view

19  the videos because a federal habeas court will not reweigh the evidence or resolve any

20  evidentiary conflicts. See Cavazos v. Smith, 565 U.S. 1, 7 (2011) (holding that Jackson

21  "unambiguously instructs that a reviewing court 'faced with a record of historical facts that

22  supports conflicting inferences must presume – even if it does not affirmatively appear in

23  the record – that the trier of fact resolved any such conflicts in favor of the prosecution,

24  and must defer to that resolution.'"), quoting Jackson, 443 U.S. at 326.

25      Petitioner also requests the record be expanded to include the transcript of a pre-trial

26  hearing where the parties agreed that Dr. Greene would not be permitted to testify as to the

27  ultimate issue of whether Petitioner actually formed the intent to kill, or premeditated or

28  deliberated the attempt to kill. (ECF No. 57 at 11-12.) Expansion is unnecessary because

Petitioner has attached the relevant transcript pages to his motion to expand.[1] (Id.) Any contention that the trial court erred in ruling that Dr. Greene would not be allowed to testify as to the ultimate issue of Petitioner's actual intent is without merit. See People v. Cortes, 192 Cal.App.4th 873, 908 (2011) (holding that defendant is not prevented under the state penal code "from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged."); Taylor v. Illinois, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence."); Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993) (Federal habeas courts "are bound by a state court's construction of its own penal statutes."); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

The Court finds that the evidence established premeditation and deliberation as those elements are defined by state law. See Jackson, 443 U.S. at 324 n.16 (holding that federal habeas courts must analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law.") It was objectively reasonable for the appellate court to find that if the jury believed Hicks' version and disbelieved Petitioner's version, they could draw a reasonable inference that Petitioner acted with deliberation and premeditation because he armed himself as he approached Hicks and "carefully weighed the considerations for and against his choice and, knowing the

---

[1] The transcript at issue reflects the trial judge ruled that Dr. Greene would not be allowed to testify that Petitioner actually formed a particular intent or was in a particular state of mind, and defense counsel confirmed that such an ultimate opinion would not be introduced. (ECF No. 57-1 at 11-12.) Dr. Greene states in his report: "It is my opinion, within a reasonable medical certainty, that due to Mr. Gonzalez's intoxication, memory impairment, and resulting judgment impairment, he was unable to form the mental state of premeditation and deliberation, and that these factors prevented him from having an intent to kill Mr. Hicks." (Lodgment No. 12 [ECF No. 38-5 at 49].)

consequences," made a quick "cold, calculated decision to kill." See Koontz, 27 Cal.4th at 1080 ("The process of premeditation and deliberation does not require any extended period of time. The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.") (internal quotation marks omitted). Federal habeas courts must respect the "factfinder's province to determine witness credibility." Jackson, 443 U.S. at 319.

In light of the additional layer of deference this Court must give in applying the Jackson standard, see Juan H., 408 F.3d at 1274, and the Supreme Court's admonition that federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction, Richter, 562 U.S. at 103, quoting Jackson, 443 U.S. at 332 n.5, it is clear that sufficient evidence was presented at trial to support Petitioner's conviction for attempted willful, deliberate and premeditated murder. The state court adjudication of this claim does not reflect "an 'unreasonable application of' Jackson and Winship to the facts of this case." Juan H, 408 F.3d at 1274. In addition, there is no basis to find that the factual findings upon which the state court's adjudication of this claim rest are objectively unreasonable. Miller-El, 537 U.S. at 340.

Accordingly, the Court finds that the state court adjudication of claim one is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court recommends habeas relief be denied as to claim one.

## C.    Claim Two

Petitioner alleges in claim two that he received ineffective assistance of counsel because his trial counsel failed to request the jury be instructed that provocation, even if insufficient to reduce attempted murder to attempted manslaughter, may negate the mental state required to show deliberation and premeditation. (ECF No. 28 at 16-22.) Respondent answers that the rejection of this claim by the appellate court, on the basis that Petitioner

22

was not prejudiced as a result of the failure to instruct because there was no substantial evidence of provocation, is neither contrary to, nor an unreasonable application of, clearly established federal law. (ECF No. 37-1 at 13-15.)

Petitioner presented this claim to the state supreme court in a petition for review which was summarily denied without a statement of reasoning. (Lodgment Nos. 6-7.) It was presented to the appellate court on direct appeal and denied in a written opinion. (Lodgment Nos. 3, 5.) The Court will look through the silent denial by the state supreme court to the last reasoned state court opinion addressing the claim, the appellate court opinion on direct appeal, which states:

> Defense counsel argued that Hicks provoked Gonzalez by yelling, cursing and landing the first blow; Gonzalez acted because of a sudden quarrel and in the heat of passion; he was so intoxicated he acted rashly and without thinking; and this was a case of imperfect self-defense. At counsel's request, the court instructed the jury on the lesser included offense of attempted voluntary manslaughter if "(t)he defendant attempted to kill someone because of a sudden quarrel or in the heat of passion" and "because he was provoked" (CALCRIM No. 603) and on complete and imperfect self-defense (CALCRIM Nos. 505, 604). The court also instructed the jury could "consider evidence of voluntary intoxication in deciding if the People (had) proved . . . deliberation and premeditation" (CALCRIM No. 3426) and that "(a) decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated" (CALCRIM No. 601). Gonzalez contends counsel was ineffective because he did not request a modified version of CALCRIM No. 522, instructing that provocation insufficient to reduce attempted murder to attempted voluntary manslaughter may nevertheless support a finding that the attempted murder was not premeditated and deliberate.
>
> The defendant has the burden of showing he received ineffective assistance of counsel, that is, that counsel did not act in a manner expected of a reasonably competent attorney and counsel's acts or omissions prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 691–692.) To establish prejudice, "(t)he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

Here, there was no substantial evidence of provocation; the evidence was, at most, """"minimal and insubstantial."""" (*People v. Middleton* (1997) 52 Cal.App.4th 19, 33.) The record does not demonstrate the lack of a request for a modified version of CALCRIM No. 522 caused Gonzalez any prejudice. (See *People v. Koontz, supra,* 27 Cal.4th at pp. 1085–1086.) This defeats his contention of ineffective assistance of counsel.

(Lodgment No. 5, <u>People v. Gonzalez</u>, No. D063129, slip op. at 8-11.)

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). For ineffective assistance of counsel to provide for relief, Petitioner must show that counsel's performance was deficient. <u>Strickland</u>, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> He must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." <u>Id.</u> To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. <u>Id.</u> at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u> Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. <u>Id.</u> at 687. "Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "The standards created by <u>Strickland</u> and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." <u>Richter</u>, 562 U.S. at 105. These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011).

To the extent the evidence of provocation was merely Hicks yelling at a group of men who were running away after one of them threw a boulder through the door of his place of business, it is objectively reasonable for the appellate court to find it was minimal and insubstantial. See e.g. <u>Schurz v. Ryan</u>, 730 F.3d 812, 815 (9th Cir. 2013) (finding no

24

prejudice under <u>Strickland</u> where trial counsel failed to argue as mitigating evidence that petitioner was provoked "in response to a minimal provocation occasioned by a few words of bravado that were not even directed at him.") However, Petitioner argues the evidence of provocation consisted of his testimony that Hicks, who is a large man, called him a motherfucker as he was running away, and, when he returned to confront Hicks, Hicks kicked him in the groin and hit him in the head while Gray, who is also a large man, was backing Hicks up by standing behind him holding a weapon, and only then did Petitioner arm himself and fight back. (ECF No. 28 at 17-22.) That evidence was supplied only by Petitioner, as Hicks said he merely asked Petitioner why he had thrown the boulder on Christmas (RT 157), and Bonesi did not testify as to provocation because he said he was running away when he realized Petitioner had turned back and was fighting Hicks. (RT 330-31.) The video did not have an audio component, and the jury was left to decide whether to believe Hicks or Petitioner regarding what Hicks said to Petitioner. In rejecting his claim of self-defense the jury apparently found Petitioner to be an unreliable or untruthful witness, although in making the determination whether substantial evidence of provocation exists, "courts should not evaluate the credibility of witnesses, a task for the jury." <u>People v. Breverman</u>, 19 Cal.4th 142, 162 (1998). Nevertheless, Petitioner testified that he did not remember why he came back to confront Hicks. (RT 475-76.) He therefore did not testify that he initiated contact with Hicks as a result of provocation. Rather, he testified that he did not pull his knife until after Hicks hit him, and said that: "Mr. Gray moved closer, or we moved closer to him, and I reacted. I pulled out my knife and struck him." (RT 477.) Although Hicks testified that he was not sure exactly what he said when he came out the back of the tavern, the video from the restaurant next door, as described by the appellate court, does not support Petitioner's contention that Hicks initiated the fight or provoked Petitioner in any manner other than the initial verbal taunts described only by Petitioner. Rather, it shows that as Petitioner approaches Hicks, Hicks "moves back slightly, stretches an arm toward [Petitioner] and moves his foot in a kicking motion, but does not touch [Petitioner, who] moves toward [Hicks, who] reciprocates, and they make

contact. Standing close together, they move toward the left and out of view, as [Petitioner] hits [Hicks] repeatedly." (Lodgment No. 5, <u>People v. Gonzalez</u>, No. D063129, slip op. at 8.) Thus, even assuming the truth of Petitioner's testimony regarding what Hicks said, the evidence did not support a finding of substantial provocation. Rather, Petitioner testified that he stabbed Hicks in self-defense, not as a result of provocation.

In any case, the jury obviously rejected Petitioner's claim of provocation when they rejected his heat of passion defense. They were instructed that Petitioner acted in the heat of passion if he "attempted the killing because he was provoked. . . . [and] the provocation would have caused an ordinary person to average disposition to act irrationally and without due deliberation, that is, from passion rather than from judgment." (RT 661.) They were also instructed that:

> While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient.

> In deciding whether the provocation was sufficient, consider whether an ordinary person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than judgment. If enough time passed between the provocation and the attempted killing for an ordinary person of average disposition to cool off and regain his or her clear reasoning and judgment, then the attempted murder is not reduced to attempted voluntary manslaughter on this basis.

(RT 661-62.)

Thus, the jury, in finding Petitioner guilty of attempted murder, rejected reducing attempted murder to attempted voluntary manslaughter based on provocation. In light of that, and in light of the lack of substantial evidence of provocation, the state court's determination that Petitioner was not prejudiced by defense counsel's failure to request the jury be instructed that the provocation can support a finding that the attempted murder was not premeditated or deliberate, is neither contrary to, nor involves an unreasonable

application of, <u>Strickland</u>. <u>See Strickland</u>, 466 U.S. at 694 (holding that in order to show prejudice, a petitioner must demonstrate "a probability sufficient to undermine confidence in the outcome."); <u>see also Richter</u>, 562 U.S. at 110 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."), quoting <u>Strickland</u>, 466 U.S. at 686. Neither is there any basis to find that the factual findings upon which the state court's adjudication of this claim rests are objectively unreasonable. <u>Miller-El</u>, 537 U.S. at 340.

Accordingly, the Court finds that the state court adjudication of claim two is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court recommends habeas relief be denied as to claim two.

### D.  Claim Three

Petitioner alleges in claim three that he was denied his right to a fair trial and a jury trial under the Sixth and Fourteenth Amendments when the trial court refused the jury's request to have the videos brought to the jury room to view "privately (without audience) to discuss among ourselves." (ECF No. 28 at 24-30; CT 321.) He contends the error prevented the jurors from deliberating and evaluating the evidence in a meaningful manner because they were precluded from discussing the videos while they were playing, and precluded from independently stopping and rewinding them as they needed or saw fit, which was necessary because the entire incident took less than 30 seconds, the figures in the videos are hard to see, and the videos are key pieces of evidence. (<u>Id.</u>)

Respondent answers that this claim does not present a federal issue because it challenges only the trial court's discretion under state law as to how to allow the jury to view the videos. (ECF No. 37-1 at 15.) Respondent alternately argues that to the extent it does raise a federal claim, the denial of the claim by the state appellate court on the basis that the trial judge did everything within technological limits to accommodate the jury's request, is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and that any error is harmless. (<u>Id.</u> at 15-17.)

Petitioner presented this claim to the state supreme court in a petition for review which was summarily denied. (Lodgment Nos. 6-7.) It was presented to the appellate court on direct appeal and denied in a written opinion. (Lodgment Nos. 3, 5.) The Court will look through the silent denial by the state supreme court to the last reasoned state court decision addressing the claim, the appellate court opinion on direct appeal, which states:

> During trial, the videos introduced into evidence were played in open court. The court instructed the jury that if it wished to see the videos again, it should send a note through the bailiff, and the videos would then be played in open court. Soon after the jury began deliberating, the court received a note asking to view the videos "privately (without audience) to discuss among ourselves." The court discussed the note with counsel, who agreed on the following procedure. Because the videos were playable only via a program on the prosecutor's laptop computer, which also contained files the jury was not entitled to see, the jury would watch the videos in open court. The court would suggest to the jurors that each video be played three times, would admonish them not to speak while viewing the videos and would tell them to write another note if they wished to view the videos again. The court informed the jurors of the procedure, and before the videos were played, received a note from the jury asking whether the videos would be played in real time, or if they could be played in slow motion. The court responded the videos would be played in real time, and if the jurors wished to see the videos in slow motion, they should send another note.

> At defense counsel's request, the court allowed the jury to gather around the screen to obtain a better view. The videos were played three times. The jury returned to the deliberation room, and a short time later sent the court a note asking to view the video taken outside the Hard Luck Tavern three times frame by frame and once in real time. The court responded that for technological reasons, the video could not be played frame by frame, so it would be played a couple of times at quarter speed and then a couple of times at half speed. The court told the jurors to make a note of any point they would like the video stopped, and the court would try to accommodate any request. The court admonished the jury not to hold any discussions in open court, then had the video played twice at quarter speed and twice at half speed. The court asked the jurors if they wished the video played again at quarter or half speed. The jurors did not ask to see the video again. The court told the jurors to send another note if they had further requests. After the jury left the courtroom, the court stated its belief that the video could not be played more slowly than quarter speed. The prosecutor agreed. Defense counsel did not comment.

1      The next morning, the jury sent the court a note asking to see the video
2 "at (quarter) speed and (half) speed, three times." Defense counsel told the
court that he and the prosecutor "would like to have the jurors review the
3 videos as if they were in a private deliberative area." The court closed the
4 courtroom and directed the jurors not to talk while the video was playing. The
court told the jurors they were free to position themselves for the best view.
5 The prosecutor played the video three times each at half speed and quarter
6 speed. The court excused the jurors for further deliberations and asked them
to send another note if they had another request.
7
     A little more than one hour later, the court received a note from the jury
8 asking to view the video after the lunch break, three times in real time, two
9 times at half speed and once at quarter speed. After the lunch break, the court
10 told the jurors to position themselves for the best view and admonished them
to refrain from discussion. The video was played at the three speeds
11 requested. The jury returned to the deliberation room. After deliberating for
12 a period lasting between one and one-quarter hour and two hours 40 minutes,
the jury notified the court it had reached a verdict.
13
     Gonzalez contends that requiring the jurors to view the videos in open
14 court, without simultaneously discussing what they saw, and without
15 "independently starting, stopping and rewinding the video clips as much as
16 they wanted," "prevented the jurors from deliberating and evaluating the
evidence in a meaningful manner."
17
18      "(S)ection 1137 . . . provides that the jurors, upon retiring for
deliberation, may take with them all papers which have been received into
19 evidence (except depositions). Moreover, there is judicial authority that
20 transcripts of tape-recorded testimony may be taken into the jury room."
(*People v. Fujita* (1974) 43 Cal.App.3d 454, 473.) Nevertheless, "what may
21 be taken by the jury into the jury room is left to the sound discretion of the
22 trial court." (*People v. Walker* (1957) 150 Cal.App.2d 594, 603.)

23      Here, the court did everything possible to accommodate the jury's
24 requests to view the videos. The court allowed the jurors to position
themselves so as to have a clear view, and to view the videos at various speeds,
25 as many times as they wished. The only limits the court imposed were those
26 required by technology and the extraneous material on the prosecutor's laptop
that the jury was not entitled to see. There was no error.
27
28 (Lodgment No. 5, <u>People v. Gonzalez</u>, No. D063129, slip op. at 8-11.)

15cv1882-H-KSC

1     Petitioner alleges here, as he did in state court, that his rights to a jury trial and to a

2 fair trial under the Sixth and Fourteenth Amendments were violated by the procedures used

3 to respond to the jury's request to view the videos. (ECF No. 28 at 24-30; ECF No. 16-11

4 at 29-35, citing Remmer v. United States, 350 U.S. 377 (1956) and United States v.

5 Evanston, 651 F.3d 1080, 1084 (9th Cir. 2011).) The court in Evanston stated:

6         District courts are accorded substantial discretion in the control of jury
7     deliberations. Nevertheless, because the right to a trial by jury as fact-finder
    in serious criminal cases is "fundamental to the American scheme of justice,"
8     it is a "cardinal principle that the deliberation of the jury shall remain private
    and secret" in order to protect the jury from improper outside influence. The
9     judge's traditional role in a jury trial is thus limited to arbiter of the law and
10     manager of the trial process; the jury remains the primary finder of fact and
    essential check on arbitrary government. For these reasons, "(t)he trial judge
11     is . . . barred from attempting to override or interfere with the jurors'
12     independent judgment in a manner contrary to the interests of the accused,"
    and "it is the law's objective to guard jealously the sanctity of the jury's right
13     to operate as freely as possible from outside unauthorized intrusions
14     purposefully made," Remmer v. United States, 350 U.S. 377, 382 (1956).

15 Evanston, 651 F.3d at 1083-84 (citations omitted). In Remmer, quoted in Evanston, the

16 Supreme Court ordered a new trial after finding the trial judge had made an inadequate

17 inquiry into whether a juror's "untrammeled exercise of his judgment" was affected when

18 he was contacted by an outside party. Remmer, 350 U.S. at 382.

19     Even assuming the Ninth Circuit in Evanston cited Remmer for the proposition that

20 a trial judge may not, in managing a trial, interfere with the jury's deliberative process to

21 the point it infringes upon the jury's role as "the primary finder of fact and essential check

22 on arbitrary government," that did not occur here. Each request by the jury to view the

23 videos was granted, the trial judge encouraged them to ask for additional viewings at

24 whatever speed they thought necessary, and their requests were accommodated as the

25 available technology permitted.

26     Petitioner has not identified any clearly established federal law supporting his

27 contention that the jury's ability to deliberate was curtailed to the point of a violation of a

28 fair trial or his right to a jury trial. Rather, "if a habeas court must extend a rationale before

it can apply to the facts at hand," then by definition the rationale was not 'clearly established at the time of the state-court decision.'" Woodall, 134 S.Ct. at 1706, quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004). The Supreme Court has stated that § 2254(d)(1) does not require an "identical factual pattern before a legal rule must be applied." Woodall, 134 S.Ct. at 1706, quoting Panetti v. Quarterman, 551 U.S. 930, 953 (2007). Rather, "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Woodall, 134 S.Ct. at 1706-07, quoting Richter, 131 S.Ct. at 787.

The Court finds that the state appellate court's determination that Petitioner's rights to a fair trial and to a jury trial were not violated as a result of the jury being required to view the videos in the courtroom rather than the jury room, is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Woodall, 134 S.Ct. at 1706; Evanston, 651 F.3d at 1084. In addition, there is no basis to find that the factual findings upon which the state court's adjudication of this claim rests are objectively unreasonable. Miller-El, 537 U.S. at 340.

Furthermore, even assuming there was an error, it is clearly harmless. In applying harmless error review, a federal habeas court must examine whether the error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). "Under this standard, an error is harmless unless the 'record review leaves the conscientious judge in grave doubt about the likely effect of an error . . . (i.e.,) that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" Padilla v. Terhune, 309 F.3d 614, 621-22 (9th Cir. 2002), quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995) and citing Kotteakos v. United States, 328 U.S. 750, 765 (1946) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.")

15cv1882-H-KSC

Although the jury was not allowed to discuss what they were seeing amongst themselves while they were viewing the videos, each time they viewed the videos they immediately retired to the jury room where they were able to discuss what they had just seen. They repeated that process several times, and were invited by the trial judge to do so as often they felt necessary. Although that process was not as efficient as allowing the jury to deliberate while watching the videos, there is nothing to suggest they were precluded from examining and evaluating the evidence completely. Thus, there is no basis to find the procedure "had a substantial and injurious effect or influence" on their verdict. Brecht, 507 U.S. at 623.

Accordingly, the Court finds that the state court adjudication of claim three is neither contrary to, nor involves an unreasonable application of, clearly established federal law, is not based on an unreasonable determination of the facts, and that any error is harmless. The Court recommends habeas relief be denied as to claim three.

### E.    Claims Four and Five

Petitioner alleges in claim four that the trial court erred in admitting evidence of his statements to Dr. Greene because they were taken without Miranda warnings. (ECF No. 28 at 32-39.) His interview with Dr. Greene took place while he was in custody handcuffed to an interrogation table, and he contends he was coerced into making the statements and forced to testify at trial as a result. (Id.) He alleges in claim five that his trial counsel was deficient in failing to object to the admission of the statements on Miranda grounds. (Id. at 41.) He claims he was prejudiced by the admission of his incriminating statements regarding the circumstances of the fight, and by the highly prejudicial factors from his personal history, including his issues with anger and frequent fighting. (Id.)

Respondent answers that these claims, and claims six through eight, are procedurally defaulted because they were denied as untimely by the state court. (ECF No. 37-1 at 17-19.) Petitioner replies that they are not defaulted because although the trial and appellate court found them untimely, the state supreme court did not, and argues that he can excuse any default. (ECF No. 50 at 3; ECF No. 56 at 4-21.)

32

Petitioner first presented these claims to the state court in a habeas petition filed in the superior court. (Lodgment No. 8.) That court denied the petition, stating:

> In this case, though he included Judicial Council Form MC-275 in his paperwork, Petitioner has utterly failed to make proper use of it, which is mandatory for self-represented inmates in the absence of a showing of good cause. (California Rules of Court rule 4.551, subd. (a)(1), (a)(2).) Petitioner offers no explanation for this omission, and the court declines to overlook it.

> More importantly, Petitioner offers no explanation for his delay of over one year in bringing his petition, and also offers no explanation as to why the matters of which he now complains, if they had merit, were not raised in the trial court and/or in the Court of Appeal, where he was represented by new counsel.

(Lodgment No. 9, In re Gonzalez, No. EHC01959, order at 1-2.)

Petitioner then presented the claims to the state appellate court in a habeas petition. (Lodgment No. 10.) The appellate court denied the petition, stating as relevant to claims four and five here:

> Gonzalez is not entitled to habeas corpus relief. The petition, filed more than three years after sentencing without any explanation for the delay, is barred as untimely. (In re Reno (2012) 55 Cal.4th 428, 459; In re Swain (1949) 34 Cal.2d 300, 302.) The Miranda-based claims are further barred because Gonzalez could have raised them on direct appeal, but did not. (In re Reno, supra, at p.490; In re Dixon (1953) 41 Cal.2d 756, 759.) "In this state a defendant is not permitted to try out his contentions piecemeal by successive proceedings attacking the validity of the judgment against him." (In re Connor (1940) 16 Cal.2d 701, 705.)

> Even if Gonzalez's claims were not procedurally barred, they would be rejected on the merits. The claims based on alleged failure to provide Miranda warnings are frivolous. Such warnings are required only in the context of "custodial interrogation," which means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (Miranda, supra, 384 U.S. at p. 444, italics added.) Dr. Greene was retained by defense counsel to examine Gonzalez to determine whether any psychiatric problems, including intoxication, contributed to the crimes with which he was charged. Gonzalez presents no evidence Dr. Greene was working for law enforcement. "Absent evidence of complicity on the part of law enforcement officials, the

33

admissions or statements of a defendant to a private citizen infringed no constitutional guarantees." (*People v. Mangiefico* (1972) 25 Cal.App.3d 1041, 1049.) In any event, once Gonzalez introduced testimony from Dr. Greene on the intoxication defense, the prosecutor was permitted to introduce evidence of statements Gonzalez made about the crimes during his examination by Dr. Greene. (*Kansas v. Cheever* (2013) 571 U.S. __, __ (134 S.Ct. 596, 602).) Because a *Miranda* objection to introduction of the statements in Dr. Greene's psychiatric report would properly have been overruled, Gonzalez's trial counsel did not provide ineffective assistance by failing to make the objection. (See, e.g., *People v. Price* (1991) 1 Cal.4th 324, 387 ("Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile.").)

(Lodgment No. 11, In re Gonzalez, D069783, slip op. at 2.)

Finally, Petitioner presented the claims to the state supreme court in a habeas petition. (Lodgment No. 12.) The court denied that petition with an order which stated: "Petition for writ of habeas corpus denied." (Lodgment No. 13, In re Gonzalez, No. S233162, order at 1.)

Petitioner contends that although the trial and appellate courts found his claims untimely, they are not procedurally defaulted because the state supreme court did not expressly do so in its silent denial. (ECF No. 50 at 19, citing Harris v. Reed, 489 U.S. 255, 263 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.") (internal quotation marks omitted)). However, as Petitioner recognizes (ECF No. 50 at 19), this Court must apply a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst, 501 U.S. at 803-06; see also Bonner v. Carey, 425 F.3d 1145, 1148 n.13 (9th Cir. 2005) (applying Ylst presumption to look through silent denial of habeas petition by California Supreme Court to the lower state court habeas decision).

Petitioner argues the Court should look through the silent denial by the state supreme court to the merits determination rather than to the untimeliness finding. (ECF No. 50 at

19.) However, the fact that the state court alternately reached the merits of the claims does not preclude the application of a procedural default in this Court. See Harris, 489 U.S. at 264 n.10 ("[A] state court need not fear reaching the merits of a federal claim in the *alternative* holding. . . . as long as the state court explicitly invokes a state procedural bar as a separate basis for decision. In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.") Thus, the Court presumes that the state supreme court's silent denial is based on the finding of untimeliness by the appellate court as well as on the merits, and finds that a procedural default is not precluded by the state court reaching the merits in the alternative.

In order to preclude federal review based on a procedural default, a state procedural bar must rest on a state ground which is "independent" of federal law and "adequate" to forever bar federal review. Coleman v. Thompson, 501 U.S. 722, 735 (1991). To be "independent" the state law basis for the decision must not be interwoven with federal law. Michigan v. Long, 463 U.S. 1032, 1040-41 (1983). In order to be "adequate," the state procedural bar must be "clear, consistently applied, and well-established at the time of the petitioner's purported default." Calderon v. Bean, 96 F.3d 1126, 1129 (9th Cir. 1996). A procedural default does not arise where a state court erroneously applies a state procedural rule. Sivak v. Hardison, 658 F.3d 898, 907 (9th Cir. 2011); see also Lee v. Kemna, 534 U.S. 362, 375 (2002) (holding there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question.")

Respondent has the initial burden of pleading as an affirmative defense that a failure to satisfy a state procedural rule forecloses federal review. Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003). The burden then shifts to Petitioner to challenge the independence or adequacy of the procedural bar. Id. If Petitioner makes a sufficient showing, then the ultimate burden of proof falls on Respondent. Id.

Respondent has carried the Bennett burden with respect to the timeliness bar. See Walker v. Martin, 562 U.S. 307, 312-21 (2011) (holding that California's timeliness rule

35

1  requiring that a petitioner must seek relief without "substantial delay" as "measured from
2  the time the petitioner or counsel knew, or should reasonably have known, of the
3  information offered in support of the claim and the legal basis for the claim," is clearly
4  established and consistently applied); Bennett, 322 F.3d at 581 ("We conclude that because
5  the California untimeliness rule is not interwoven with federal law, it is an independent
6  state procedural ground.") Accordingly, the burden has shifted to Petitioner to challenge
7  the independence or adequacy of the timeliness bar. Bennett, 322 F.3d at 586.

8      Petitioner can carry his burden by showing that the timeliness rule was erroneously
9  applied in his case. Sivak, 658 F.3d at 907; Kemna, 534 U.S. at 375. He attempts to do so
10  by arguing that he "essentially complied" with the state timeliness rule, and made a good
11  faith effort to do so, by writing to his appellate counsel and notifying her of his Miranda
12  concerns while briefing on his direct appeal was still in progress. (ECF No. 28 at 105; ECF
13  No. 50 at 19-20; ECF No. 56 at 5-7.) Although he did not present that evidence in his
14  superior court habeas petition filed on August 3, 2015, he included it in both subsequent
15  state habeas petitions. (Lodgment No. 10, Ex. E [ECF No. 38-3 at 61]; Lodgment No. 12,
16  Ex. E [ECF No. 38-5 at 64].) In addition, he told the trial judge at sentencing that he had
17  informed his trial counsel that he had never been read his Miranda rights and that he
18  intended to raise that issue on appeal. (RT 874.) The trial judge on September 10, 2012,
19  and appellate counsel in a letter dated August 30, 2013, explained to Petitioner that because
20  no statement of his to law enforcement was introduced at trial, there was no basis for a
21  Miranda-based claim. (Id.; Lodgment No. 12, Ex. E [ECF No. 38-5 at 64].)

22      Because Petitioner was aware of his Miranda-based claims (four and five) at the time
23  of sentencing, and aware his appellate counsel would not raise them on appeal, yet waited
24  almost two years after being informed they would not be raised on appeal to present them
25  to the state court, he has not carried his burden under Bennett as to claims four and five.
26  His contention that he had to wait for his direct appeal to end to present his claims all at
27  once (ECF No. 56 at 19), is also insufficient to carry his Bennett burden. The Court finds
28  claims four through eight are procedurally defaulted.

1   The Court can still address the merits of the procedurally defaulted claims if
2   Petitioner can demonstrate cause for his failure to satisfy the state procedural rule and
3   prejudice arising from the default, or show that a fundamental miscarriage of justice would
4   result from the Court not reaching the merits of the defaulted claim. Coleman, 501 U.S. at
5   750. Petitioner attempts to do so by arguing that his appellate counsel was ineffective
6   because she was aware of but failed to raise the Miranda claim (claim four), and that the
7   claims he raised in his state habeas petitions could not have been discovered earlier, despite
8   his exercise of reasonable diligence, because they were due to ineffective assistance of
9   appellate counsel which did not become apparent to him until after his direct appeal ended.
10  (ECF No. 56 at 11-19.) He also argues that a default of his claims in this Court would
11  amount to a fundamental miscarriage of justice because he is actually innocent of attempted
12  premeditated murder, as he should have been found guilty of a lesser offense such as simple
13  attempted murder which carries a maximum sentence of nine years rather than life in
14  prison. (Id. at 20-21.)

15      In order to determine if Petitioner can show cause and prejudice to excuse the default
16  as to claim four alleging a Miranda violation, the Court would have to examine the merits
17  of claim five alleging ineffective assistance of counsel in failing to object on Miranda
18  grounds, and claim eight alleging ineffective assistance of appellate counsel in failing to
19  raise claims four through eight. See Murray v. Carrier, 477 U.S. 478, 488 (1986) ("[I]f the
20  procedural default is the result of ineffective assistance of counsel, the Sixth Amendment
21  itself requires that responsibility for the default be imputed to the State.") In addition,
22  because Petitioner proceeded pro se during his state habeas proceedings, he can establish
23  cause and prejudice with respect to his defaulted ineffective assistance of trial counsel
24  claims (claims five through seven), if he can establish that they are "substantial" claims.
25  See Martinez v. Ryan, 566 U.S. 1, 17 (2012) ("Where, under state law, claims of ineffective
26  assistance of trial counsel must be raised in an initial-review collateral proceeding, a
27  procedural default will not bar a federal habeas court from hearing a substantial claim of
28  ineffective assistance at trial if, in the initial review collateral proceeding, there was no

counsel or counsel in that proceeding was ineffective.") The Court must also assay the merits of claims five through seven, alleging ineffective assistance of trial counsel, in order to determine if they present "substantial" claims sufficient to excuse their defaults. See id. at 14 (holding that a claim is "substantial" if the petitioner can show that "the claim has some merit.") In making that determination, the AEDPA limitation on expanding the record does not apply. See Dickens v. Ryan, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc) (holding that a petitioner is "entitled to present evidence to demonstrate that there is 'prejudice,' that is that petitioner's claim is 'substantial' under *Martinez*. Therefore, a district court may take evidence to extent necessary to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*.")

The Ninth Circuit has indicated that: "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.") The Court must examine the merits of claim five in order to determine if the default can be excused as to claims four and five, must examine the merits of claim eight in order to determine if the default can be excused as to claims four through seven, and can avoid addressing whether expansion of the record under Martinez is necessary if it finds the procedurally defaulted ineffective assistance of counsel claims (claims five though seven) can be denied on the merits. Because these claims clearly fail on the merits, the Court finds that the interests of judicial economy will be better served by denying the procedurally defaulted claims on the merits without determining whether Petitioner can excuse the default. Franklin, 290 F.3d at 1232.

### a) Merits-claim four

Petitioner alleges in claim four that his statements to Dr. Greene were taken without Miranda warnings while he was in custody handcuffed to an interrogation table, that he was coerced into making the statements, and that he was forced to testify at trial as a result.

(ECF No. 28 at 32-39.) He contends his defense counsel pressured him into talking to Dr. Greene, and that Dr. Greene never told him his statements could be admitted into evidence. (ECF No. 50 at 21.) He contends that because his statements were admitted against him at trial, and "still being under psychological pressure for the sentence he was facing, circumstances of the case and counsel telling petitioner it was the only way to go home, petitioner testified at trial." (Id.)

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. It has been clearly established for over 50 years that the "Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." Miranda, 384 U.S. at 467; Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that "the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States.")

Actions by private parties do not generally invoke constitutional protections. See Colorado v. Connelly, 479 U.S. 157, 166 (1986) ("The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause."), citing Walter v. United States, 447 U.S. 649, 656 (1980) ("It has, of course, been settled since Burdeau v. McDowell, 256 U.S. 465 [1921] that a wrongful search or seizure by a private party does not violate the Fourth Amendment and that such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully.") However, the Ninth Circuit has held that Miranda may apply when the private person with whom the suspect is speaking is "acting on behalf of the state." Jones v. Cardwell, 686 F.2d 754, 756 (9th Cir. 1982); Estelle v. Smith, 451 U.S. 454, 464-68 (1981) (holding that a court appointed psychiatrist must provide warnings and secure a waiver before examining a suspect if information is to be used against him). To determine if Miranda warnings are appropriate in that situation, the Court considers factors such whether there was a pre-existing agreement between the

1  private individual and the police, whether the private individual was acting on his or her
2  own initiative, and whether there is a quid pro quo underlying the private individual's
3  relationship with the state. United States v. Pace, 833 F.2d 1307, 1313 (9th Cir. 1987).

4      The state appellate court's determination that Miranda warnings were not required
5  because Petitioner was questioned by an expert witness retained by defense counsel rather
6  than law enforcement officials, is consistent with clearly established federal law. See
7  Smith, 451 U.S. at 468 ("A criminal defendant, *who neither initiates a psychiatric*
8  *evaluation nor attempts to introduce any psychiatric evidence*, may not be compelled to
9  respond to a psychiatrist if his statements can be used against him.") (emphasis added).
10  Accordingly, the Court recommends denying claim four on the merits because the state
11  court adjudication of the claim is neither contrary to, nor involves an unreasonable
12  application of, clearly established federal law. Id. Nor is there any basis to find that the
13  factual findings upon which the state court adjudication of this claim rests are objectively
14  unreasonable. Miller-El, 537 U.S. at 340.

15          **b)    Merits-claim five**

16      Petitioner alleges in claim five that his trial counsel rendered ineffective assistance
17  in failing to object to the admission of his statements to Dr. Greene on the basis they were
18  obtained without Miranda warnings. (ECF No. 28 at 41.) He contends he was prejudiced
19  by his incriminating statements to Dr. Greene regarding the circumstances of the fight and
20  the highly prejudicial factors from his personal history, including his issues with anger and
21  his frequent fighting. (Id.)

22      As quoted above, the state appellate court determined that because any objection on
23  Miranda grounds would have been overruled, defense counsel did not render deficient
24  representation due to a failure to object. That determination is consistent with the clearly
25  established federal law discussed above precluding the need for Miranda warnings absent
26  a relationship between Dr. Greene and law enforcement. Petitioner has failed to show his
27  trial counsel "made errors so serious that counsel was not functioning as the 'counsel'
28  guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687.

Petitioner has also failed to show that counsel's alleged deficient performance prejudiced the defense because he has failed to demonstrate "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; Richter, 562 U.S. at 110 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."), quoting Strickland, 466 U.S. at 686. There is no such probability here because, as the state court correctly observed, an objection based on Miranda would have been overruled.

Petitioner requests expansion of the record to include the transcript of a pre-trial hearing where the trial judge asked defense counsel for an offer of proof regarding Dr. Greene's testimony, and defense counsel replied:

> He is going to offer opinions that are based upon his understanding of the amount of alcohol consumed by Mr. Gonzalez; that he had impairment on the day of the incident; that the alcohol impaired his ability to perceive, his ability to judge, et cetera. That is basically it. He is not going to say that he didn't have the mental intent at the time of the incident. But with the impairment and the alcohol, that his ability to deliberate and so forth is impacted. [¶] He is not going to testify to the ultimate fact as to whether or not he had – at the time of the incident, he did not have the mental intent to kill or to premeditate, deliberate, et cetera.

(ECF No. 57-1 at 11-12.)

Petitioner appears to claim that if he had been advised of his right to remain silent, he would not have made the incriminating statements to Dr. Greene which the prosecutor elicited from Petitioner on cross-examination, and defense counsel still could have introduced Dr. Greene's opinion regarding the effect alcohol has on a person's judgment and perception. However, Dr. Greene's testimony went beyond a general opinion on the effects of alcohol. He opined that Petitioner was likely being truthful about the amount of alcohol he consumed that night, and that such an amount would cause a person to act irrationally and impulsively, and impair their judgment, memory and mental capacity. (RT 559-61, 565-69, 605, 613-14.) He also opined that Petitioner was being truthful with regard to his selective memory loss, which was a very important issue with regard to intent. (RT

551, 606-07, 617.) Because Dr. Greene could not have provided those opinions without interviewing Petitioner, there is no support for Petitioner's claim that defense counsel rendered ineffective assistance by allowing Dr. Greene to interview Petitioner without Miranda warnings. See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance of counsel in any given case. Even the best criminal defense attorneys would not defend a particular client the same way.")

In light of the admonishment by the Supreme Court that "[t]he standards created by Strickland and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so," Richter, 562 U.S. at 105, and that the standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt," Pinholster, 563 U.S. at 181, it is clear that the state court determination that Petitioner did not receive ineffective assistance by trial counsel's failure to object to the admission of his statements to Dr. Greene on Miranda grounds is neither contrary to, nor involves an unreasonable application of, Strickland. There is no basis to find that the factual findings upon which the state court's adjudication of this claim rests are objectively unreasonable. Miller-El, 537 U.S. at 340.

### c) Conclusion-claims four and five

In sum, the Court finds that claims four and five are procedurally defaulted, and that judicial economy counsels in favor of reaching the merits of the claims without determining whether Petitioner can overcome the default because, even assuming he could make such a showing, he is not entitled to habeas relief as the state court adjudication of these claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court recommends habeas relief be denied as to claims four and five.

### F. Claim Six

Petitioner alleges in claim six that he received ineffective assistance of trial counsel due to counsel's failure to object when the prosecutor said in his opening statement and closing argument that Bonesi lifted Petitioner off the victim, and when the prosecutor asked

Petitioner on cross-examination if Bonesi had lifted him off the victim. (ECF No. 28 at 43-47.) Respondent answers that this claim is procedurally defaulted due to the state court denial of the claim as untimely. (ECF No. 37-1 at 17-19.)

Petitioner presented this claim to the state supreme court in a habeas petition which was summarily denied. (Lodgment Nos. 12-13.) He previously presented the claim to the appellate court in a habeas petition. (Lodgment No. 10.) That court denied the petition as untimely, and then reached the merits in an alternate ruling. (Lodgment No. 11.)

For the same reasons set forth above with respect to claims four and five, the Court finds that this claim is procedurally defaulted because it was denied by the state court as untimely. Also as discussed above with respect to claim five, the Court finds that judicial economy counsels in favor of reaching the merits of the claim without determining whether Petitioner can overcome the default because it clearly fails on its merits.

The Court will look through the silent denial by the state supreme court to the appellate court order, which stated:

> As for the failure to object to statements of the prosecutor and witnesses that Gonzalez was pulled off the victim, Gonzalez neither identifies any basis for a meritorious objection nor explains how the exclusion of those statements would have led to a better outcome.

(Lodgment No. 11, In re Gonzalez, D069783, slip op. at 3.)

Petitioner has not demonstrated deficient performance by his trial counsel's failure to object to the prosecutor's comment because prosecutors are free to argue "reasonable inferences from the evidence." United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989). Bonesi testified that he approached Petitioner and tapped him on the shoulder just before Petitioner got up by himself. (RT 337.) Bonesi identified himself on the video from the restaurant next door as the man who is seen running into the scene, getting down behind the car Petitioner and Hicks had fallen behind, and then standing up and throwing Petitioner ahead of him just before he and Petitioner are seen running away. (RT 338-39.) Gray testified that he witnessed Bonesi grab Petitioner by the back of the shirt and pull Petitioner off Hicks. (RT 185.)

15cv1882-H-KSC

Petitioner requests the record be expanded to include the transcript of a pre-trial hearing where the prosecutor argued that Bonesi should not be allowed to testify as to why he pulled Petitioner off Hicks during the fight, which defense counsel indicated was in order to save Petitioner from being tased by Gray, on the basis that it was improper opinion evidence, speculative, lacked foundation, and could trigger an accomplice instruction. (ECF No. 54 at 4-7; see Lodgment No. 12 [ECF No. 38-5 at 87-90] for complete transcript.) The prosecutor stated that Bonesi had agreed to testify pursuant to a cooperation agreement (although he was ultimately called as a defense witness), having already pleaded guilty to a misdemeanor charge of accessory after the fact. (Id.) The trial judge deferred ruling on any objections until Bonesi testified. (Id.) Petitioner attached the transcript pages here and to his state habeas petitions. (Id.; Lodgment No. 8 [ECF No. 38-1 at 109-16]; Lodgment No. 10 [ECF No. 38-3 at 87-92]; Lodgment No. 12 [ECF No. 38-5 at 87-90].)

Expansion of the record is unnecessary to the resolution of this claim because Gray testified that he witnessed Bonesi grab Petitioner and pull him off Hicks. (RT 185.) Thus, irrespective of Bonesi's actual or proffered testimony, there was no basis for an objection to the prosecutor's statements that Bonesi picked Petitioner up off Hicks to end the fight because Gray testified he saw that happen. Although Bonesi denied pulling Petitioner off Hicks at trial, he testified that he gave Petitioner "sort of a little push" ahead of him before they ran off together. (RT 338.) Accordingly, the prosecutor did not make an objectionable statement when he told the jury in opening statements that the evidence would show that Bonesi picked Petitioner up off of Hicks, argued to the jury in closing that the evidence had shown just that, and when he asked Petitioner on cross-examination if that is what happened. Petitioner has failed to show that his trial counsel was deficient in failing to make a frivolous objection to those statements and that question, particularly in light of the fact that an overruled objection might have brought unwanted attention to whether Petitioner had to be pulled off Hicks. See Matylinsky v. Budge, 577 F.3d 1083, 1091 (9th Cir. 2009) (holding that a petitioner must overcome a "heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy.")

Petitioner has also failed to demonstrate prejudice arising from the failure to make such a baseless objection because he has failed to demonstrate "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; Richter, 562 U.S. at 110 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."), quoting Strickland, 466 U.S. at 686. Accordingly, the state court adjudication of this claim is neither contrary to, nor involves an unreasonable application of, Strickland. Neither is there any basis to show that the factual findings upon which the state court's adjudication of this claim rests are objectively unreasonable. Miller-El, 537 U.S. at 340.

The Court finds that claim six is procedurally defaulted, and that judicial economy counsels in favor of denying the claim on the merits without making a determination whether Petitioner can overcome the default because, assuming Petitioner could make such a showing, he is not entitled to federal habeas relief since the state court adjudication of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court finds that expansion of the record is unnecessary because the requested transcript is in the record. The Court recommends habeas relief be denied as to claim six.

## G. Claim Seven

Petitioner alleges in claim seven that he received ineffective assistance of counsel due to trial counsel's failure to request a jury instruction on voluntary intoxication causing unconsciousness. (ECF No. 28 at 49-52.) Petitioner argues counsel should have requested a modified version of California Jury Instruction 626, which states: "When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter." (Id. at 102-04.) He contends that if the jury found that he blacked out during the killing, they would not have found premeditation and deliberation had they been so instructed. (Id. at 51.)

1   Respondent answers that review of this claim is precluded as procedurally defaulted
2   because the state court found the claim untimely. (ECF No. 37-1 at 17-19.)

3       Petitioner presented this claim to the state supreme court in a habeas petition which
4   was summarily denied. (Lodgment Nos. 12-13.) He previously presented the claim to the
5   appellate court in a habeas petition. (Lodgment No. 10.) That court denied the petition as
6   untimely, and then reached the merits in an alternate ruling. (Lodgment No. 11.)

7       For the same reasons set forth above, the Court finds that this claim is procedurally
8   defaulted, and, because the claim clearly fails on its merits, that judicial economy counsels
9   in favor of denying the claim on the merits instead of making a determination whether
10  Petitioner can overcome the default. The Court will look through the silent denial by the
11  state supreme court to the appellate court order, which stated:

> As for the failure of trial counsel to request a jury instruction on
> unconsciousness due to voluntary intoxication (CALCRIM No. 626),
> Gonzalez identifies no substantial evidence he was unconscious when he
> repeatedly stabbed the victim. (See *People v. Ochoa* (1998) 19 Cal.4th 353,
> 424 (no duty to instruct on unconsciousness due to voluntary intoxication
> when there "was no *quantum satis* of evidence to warrant an instruction").) It
> also does not appear the failure to request the instruction caused any prejudice,
> for the jury found Gonzalez guilty of willful, deliberate, and premeditated
> attempted murder even though other instructions (CALCRIM Nos. 601 &
> 3426) advised the jury his voluntary intoxication could have prevented the
> deliberation and premeditation required to find him guilty.

20  (Lodgment No. 11, In re Gonzalez, D069783, slip op. at 3.)

21      The appellate court correctly observed that there was no evidence Petitioner was
22  unconscious at any point during the events due to his voluntary intoxication. In fact, the
23  only evidence of intoxication was his testimony and the testimony of his friend Bonesi.
24  Even assuming the jury believed their testimony regarding how much alcohol they had
25  consumed, and credited Dr. Greene's testimony that it was enough to impair Petitioner's
26  memory and judgment, Petitioner did not testify that he was ever unconscious, and there
27  was no evidence of unconsciousness. Although he testified he could not remember certain
28  events, eyewitness testimony and the video evidence does not support a finding he ever

lost consciousness. The fight was brief, and other than when Petitioner was out of sight of the video on the ground repeatedly stabbing Hicks, it is obvious from the video as described by the appellate court that Petitioner was conscious the entire time. Gray testified as to Petitioner's behavior while he was not visible on the video, and said that Petitioner was on top of Hicks stabbing him repeatedly. (RT 181-85.) Bonesi testified that Petitioner and Hicks were on the ground fighting up until Bonesi tapped Petitioner on the shoulder and Petitioner disengaged. (RT 336-37.) There was insufficient evidence of unconsciousness to support the instruction. People v. Rogers, 39 Cal.4th 826, 888 (2006) ("Defendant's professed inability to recall the event, without more, was insufficient to warrant an unconsciousness instruction.") Petitioner has provided no basis for the Court to expand the record to include the videos, which were described by the appellate court, by the attorneys in argument, and during examination of the witnesses, because he has made no showing as to how they support this or any other claim presented in the Petition.

Because there is insufficient evidence that Petitioner was unconscious, he has not shown his trial counsel was deficient in failing to request an instruction regarding voluntary intoxication causing unconsciousness. See Matylinsky, 577 F.3d at 1091 (holding that a petitioner must overcome a "heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."); see also Knowles v. Mizayance, 556 U.S. 111, 122 (2009) (holding that defense counsel was not deficient in abandoning a defense with "almost no chance of success" even though there was "nothing to lose" by raising the defense). Petitioner has also failed to demonstrate "a probability sufficient to undermine confidence in the outcome" arising from his trial counsel's failure to request an instruction for which there was no evidentiary support, and therefore cannot satisfy the prejudice prong of an ineffective assistance claim. Strickland, 466 U.S. at 694; see also Richter, 562 U.S. at 110 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."), quoting Strickland, 466 U.S. at 686. The state court adjudication of this claim is neither contrary to, nor involves an unreasonable application of, Strickland.

1  Neither is there any basis to show that the factual findings upon which the state court
2  adjudication of this claim rests are objectively unreasonable. <u>Miller-El</u>, 537 U.S. at 340.

3       The Court finds that claim seven is procedurally defaulted, and that judicial economy
4  counsels in favor of denying the claim on the merits without determining whether Petitioner
5  can overcome the default because the state court adjudication of the claim is neither
6  contrary to, nor involves an unreasonable application of, clearly established federal law,
7  and is not based on an unreasonable determination of the facts. The Court recommends
8  relief be denied as to claim seven.

9       **H.    Claim Eight**

10       Petitioner alleges in claim eight that he received ineffective assistance of appellate
11  counsel in failing to raise claims four through seven on appeal. (ECF No. 28 at 54.)
12  Respondent answers that this claim is procedurally defaulted because it was denied as
13  untimely in the state court. (ECF No. 37-1 at 17-19.)

14       Petitioner presented this claim to the state supreme court in a habeas petition which
15  was summarily denied. (Lodgment Nos. 12-13.) He previously presented the claim to the
16  appellate court in a habeas petition. (Lodgment No. 10.) That court denied the petition as
17  untimely, and then reached the merits in an alternate ruling. (Lodgment No. 11.)

18       For the reasons set forth above, the Court finds this claim is procedurally defaulted,
19  and, because it clearly fails on the merits, judicial economy counsels in favor of reaching
20  the merits rather than determining whether Petitioner can overcome the default. The Court
21  will look through the state supreme court order to the appellate court order, which stated:

22           Since these claims of ineffective assistance of trial counsel and the
23       *Miranda*-based claims raised by Gonzalez have no merit, appellate counsel
         did not provide ineffective assistance by not raising the claims on appeal. (See
24       *In re Smith* (1970) 3 Cal.3d 192, 202 (appellate counsel must "raise crucial
25       assignments of error, which arguably might have resulted in a reversal"); *In
         re Richardson* (2011) 196 Cal.App.4th 647, 660 (no ineffective assistance
26       when appellate counsel's "decision not to raise the argument . . . was
27       reasonable").)

28  (Lodgment No. 11, <u>In re Gonzalez</u>, D069783, slip op. at 3.)

15cv1882-H-KSC

It is an objectively reasonable application of <u>Strickland</u> for the state court to find that Petitioner's appellate counsel was entitled to make a tactical decision not to raise weak and unsupported claims. <u>See Turner v. Calderon</u>, 281 F.3d 851, 872 (9th Cir. 2002) (explaining that the <u>Strickland</u> standard applies to claims of ineffective assistance of appellate counsel); <u>Miller v. Keeney</u>, 882 F.2d 1428, 1434 (9th Cir. 1989) (holding that appellate counsel has no constitutional obligation to raise every nonfrivolous issue on appeal because "[i]n many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.") It is clear from the discussion of claims four through seven above that it was objectively reasonable for the state court to find that appellate counsel was not deficient in failing to raise those claims on appeal. <u>See Gustave v. United States</u>, 627 F.2d 901, 906 (9th Cir. 1980) ("There is no requirement that an attorney appeal issues that are clearly untenable."); <u>Woods v. Etherton</u>, 576 U.S. ___, ___, 136 S.Ct. 1146, 1152-53 (2016) (finding no <u>Strickland</u> prejudice arising from appellate counsel's failure to raise claim of ineffective assistance of trial counsel where there was no <u>Strickland</u> prejudice arising from trial counsel's alleged error).

The Court finds that claim eight is procedurally defaulted, and that judicial economy counsels in favor of denying the claim on the merits without determining whether Petitioner can overcome the default because the state court adjudication is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court recommends habeas relief be denied as to claim eight.

### E.    Claim Nine

Petitioner contends in his final claim he was denied access to the courts by the denial of his state habeas petitions as untimely because they were in fact timely. (ECF No. 28 at 56.) Respondent answers that this claim is without merit because the timeliness finding is correct, and Petitioner was not denied access to the courts because his state habeas petitions were filed, and his claims considered and denied on the merits. (ECF No. 37-1 at 19.)

1   Petitioner presented this claim to the state supreme court in a habeas petition which
2   was summarily denied. (Lodgment Nos. 12-13.) He previously presented the claim to the
3   state appellate court in a habeas petition. (Lodgment No. 10.) That court denied the
4   petition as untimely, and then reached the merits in an alternate ruling, stating:

5       Finally, this court does not address Gonzalez's challenge to the superior
6       court's order denying the petition for writ of habeas corpus he filed in that
        court. That order is not appealable or otherwise reviewable by this court. (*In
7       re Clark* (1993) 5 Cal.4th 750, 767, fn. 7; *In re Crow* (1971) 4 Cal.3d 613,
        621, fn. 8.)
8
9   (Lodgment No. 11, In re Gonzalez, D069783, slip op. at 3.)

10      The United States Supreme Court has found that California's timeliness rule, which
11  requires that a petitioner seek relief without "substantial delay" as "measured from the time
12  the petitioner or counsel knew, or should reasonably have known, of the information
13  offered in support of the claim and the legal basis for the claim," is clearly established and
14  consistently applied. Walker, 562 U.S. at 312-21. As the state appellate court observed,
15  Petitioner waited over three years after he was sentenced to raise his trial error claims in
16  his appellate court habeas petition. He has not identified an error in the appellate court's
17  application of its timeliness rule, but even if he could, there is no federal due process
18  violation because his claims were addressed on the merits despite the state procedural bar.
19  See e.g. Estelle, 502 U.S. at 72 (holding that to merit federal habeas relief based on an error
20  of state law, the petitioner must show that the error, considered in the context of the record
21  as a whole, so infected the entire proceedings that the conviction violated due process).

22      The Court finds that the state court adjudication of claim nine is neither contrary to,
23  nor involves an unreasonable application of, clearly established federal law, and is not
24  based on an unreasonable determination of the facts. Accordingly, the Court recommends
25  denying habeas relief as to claim nine.

26      **H.     Evidentiary Hearing/Expansion of the Record**
27      Petitioner requests an evidentiary hearing. (ECF No. 50 at 3-4.) He also requests
28  expansion of the record to include the videos which were introduced at trial, and the

15cv1882-H-KSC

transcripts of the pre-trial motions involving the admissibility of Bonesi's testimony and the offer of proof regarding Dr. Greene's opinion testimony, both discussed above, which Petitioner contends will help with an evidentiary hearing, and because he "believes they are important so that this court can have a full concept for the case and claims." (ECF No. 57 at 1-3; ECF No. 54 at 4-6; ECF No. 59 at 1-3.) As discussed above, Petitioner has not shown how the additional transcripts (which Petitioner has placed before this Court in any case), or the video exhibits, would assist in the resolution of any claim. The Court recommends denying Petitioner's request for an evidentiary hearing and expansion of the record because, even assuming the allegations in the Petition are true, the state court record presently before the Court provides an adequate basis to adjudicate his claims. See Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994) (holding that an evidentiary hearing is not necessary where the federal claim can be denied on the basis of the state court record, and where the allegations, even if true, do not provide a basis for relief).

## IV.   CONCLUSION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **November 10, 2017**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

//
//
//
//
//
//
//
//

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with
2    the Court and served on all parties no later than **December 1, 2017.** The parties are advised
3    that failure to file objections with the specified time may waive the right to raise those
4    objections on appeal of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th
5    Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

6    Dated: October 5, 2017

Hon. Karen S. Crawford
United States Magistrate Judge

15cv1882-H-KSC