# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE GONZALEZ, JR.,<br><br>                                    Petitioner,<br><br>v.<br><br>SCOTT KERNAN, Secretary,<br><br>                                    Respondent. | Case No.:  3:15-cv-01882-H-KSC<br><br>**ORDER:**<br><br>**(1) DENYING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS;**<br><br>[Doc. Nos. 28, 30]<br><br>**(2)ADOPTING REPORT AND RECOMMENDATION; AND**<br><br>[Doc. No. 62]<br><br>**(3) DENYING CERTIFICATE OF APPEALABILITY** |

On August 24, 2015, Petitioner Jesse Gonzalez, Jr., a state prisoner proceeding *pro se* and *in forma pauperis*, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state court conviction. (Doc. No. 1.) On December 2, 2015, Respondent Neil McDowell filed an answer to the petition. (Doc. No. 15.) On January 26, 2016, Petitioner filed a traverse. (Doc. No. 25.) On June 20, 2016, Petitioner filed a first

amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 28.) On June 24, 2016, Petitioner filed amendments to his habeas corpus petition. (Doc. No. 30.) On August 22, 2016, Respondent filed an answer to the first amended petition. (Doc. No. 37.) On December 13, 2016, Petitioner filed a traverse. (Doc. No. 50.) On October 11, 2017, the magistrate judge issued a report and recommendation ("R&R"), recommending that the Court deny the petition for writ of habeas corpus. (Doc. No. 62.) On November 17, 2017, Petitioner filed objections to the magistrate judge's R&R, (Doc. No. 65), and on December 11, 2017, Petitioner filed amended objections to the R&R. (Doc. No. 73; see Doc. No. 75 (resubmitted copy of amended objections, including pages missing from original filing).) After careful consideration, the Court denies the petition for writ of habeas corpus and adopts the magistrate judge's R&R.

## **BACKGROUND**

### I.    **Factual History**

The Court adopts the facts from the California Court of Appeal's opinion denying Petitioner's direct appeal and affirming his conviction. (See Doc. No. 16-13, Lodgment No. 5.) This Court, pursuant to 28 U.S.C. § 2254(e)(1), presumes the following relevant facts to be true:

THE PEOPLE'S CASE

On Christmas night 2010, Lance Hicks was working at his bar, the Hard Luck Tavern in El Centro. After the tavern closed at 2:00 am, three men came to the front door and were turned away by Hicks's wife, Ana Hicks. Within a minute or two, the back door blew open and a boulder that had been holding the door ajar tumbled inside and rolled across the floor. Hicks picked up the boulder, walked to the back door, put the boulder outside and saw the three men. Hicks said something such as, "Why Christmas? Why throw the boulder?" One of the men, Gonzalez, ran at Hicks very fast, crouching low. Hicks was scared and defended himself. He did not recall the ensuing fight, but remembered Gonzalez hugging him and stabbing him in the back. Hicks felt as if his legs disappeared. He fell on his back and Gonzalez got on top of him and began stabbing him. Hicks held up his hand, asked Gonzalez to stop, said he was hurt and asked for help and an ambulance. Ana Hicks and others gathered around. Hicks lost consciousness. His next memory was being in the

hospital many days later. He had 15 stab wounds, including wounds to his neck, chest, arm and back. He had a punctured lung. A stab wound to his spine rendered him a paraplegic.

Dorian Gray, a bartender at the Hard Luck Tavern, saw Louis Murillo and two others try to enter the tavern shortly after 2:00 am on December 26, 2010. Ana Hicks asked them to leave and they left. Approximately two minutes later, Gray heard a loud noise outside, then a loud bang on the back door, and "saw a leg leaving the back door." Hicks went outside to investigate. After a minute, Gray walked to the back door, saw a rock holding it open and heard a commotion outside. He retrieved a stun gun from behind the bar and ran outside. Gray saw Hicks lying on his back on the ground. Gonzalez had his knee on Hicks's midsection and appeared to be punching him many times, fast. Murillo and the other person who had entered the tavern were standing nearby. Murillo said, "Let's go." Gray fired the stun gun into the air twice and moved toward Hicks. Gray saw a blade in Gonzalez's hand and realized he was stabbing Hicks. Gray saw Gonzalez stab Hicks nine to ten times, and had the impression stab wounds had been inflicted before he arrived on the scene. There was blood on Gonzalez's hand, on the blade and all over Hicks. Gray attempted to use the stun gun on Gonzalez but it did not appear to have any effect. Murillo and his companion grabbed Gonzalez by the shirt and pulled him away from Hicks. Gonzalez, Murillo and the third person ran away with Gray in pursuit. Gray stopped after running five or ten feet because Hicks said he was hurt and asked for help. Gray unsuccessfully tried to help Hicks get up, then ran to the back door of the Hard Luck Tavern and yelled that Hicks had been stabbed.

Justin Bostic, an off-duty deputy sheriff, was outside the Hard Luck Tavern before the attack. He saw three individuals enter the tavern, leave immediately, pull down a fence adjacent to the tavern and walk through the opening they had created. When Bostic heard yelling, he ran in the direction the three individuals had gone. He saw Hicks lying on the ground in back of the tavern and heard him moaning and groaning. Bostic administered first aid until paramedics arrived. During that time, Hicks lost consciousness several times.

The People introduced into evidence video recordings from surveillance cameras focused on seven areas inside the Hard Luck Tavern. The People's exhibit shows the events depicted in video footage taken inside the tavern, introduced into evidence by Gonzalez and described below.

DEFENSE EVIDENCE

On the night of December 25, 2010, Ramon Bonesi was with Gonzalez

3

and Murillo at Gonzalez's home. They drank beer until around 10:00 p.m., then walked to the Owl bar, where they drank beer and hard liquor. When the Owl closed around 2:00 a.m., they walked to the Hard Luck Tavern. They entered the tavern but were escorted out a minute later because it was closing time. They began walking home, then heard a noise and began running. Bonesi, who was in front, noticed Gonzalez was no longer behind him, and went back to look for him. Bonesi saw a scuffle near the back door of the Hard Luck Tavern. Hicks was on the ground; Gonzalez was on top of him, punching him; and Hicks was fighting back. Bonesi tapped Gonzalez on the shoulder and Gonzalez got up. Bonesi did not see anyone else until Gray came at them with the stun gun. Gonzalez, Murillo and Bonesi ran to Gonzalez's house. Bonesi saw a cut on Gonzalez's arm and asked about it. Gonzalez said he had stabbed someone during the fight. Gonzalez later told Bonesi that he had blacked out and did not remember the incident.

Gonzalez testified that on December 25, 2010, he drank two beers and smoked a marijuana cigarette at home. Bonesi arrived in the late afternoon with an 18-pack of beer. They drank all of the beer and smoked marijuana. Murillo joined them. They drank more beer. Gonzalez drank a total of at least 20 beers. The three men walked to the Owl bar. Gonzalez carried a knife with a four to five-inch blade. At the Owl he drank beer and two or three shots of tequila. He left the Owl, went to the Conga bar and drank more beer. Then, with Bonesi and Murillo, he tried to enter the Hard Luck Tavern. They were unsuccessful. As they left the tavern, Gonzalez saw a big rock. He threw it in the direction of the door, thinking "it would be funny," then ran. He did not remember walking back to Hicks, but did remember Hicks in front of him, yelling and cursing. Hicks hit him in the head a couple of times and kicked him. Gray was behind Hicks and appeared to have a weapon. Gonzalez was scared. He hit Hicks with his fist, and when Gray moved closer, Gonzalez pulled out his knife and struck Hicks in the abdominal area. Gonzalez "blacked out" and did not remember hitting or stabbing Hicks again, but did remember Hicks was on his back, Gonzalez was on top of him and Hicks was grasping his collar. Gonzalez "pushed [Hicks] off" and ran home, discarding the knife on the way. When Gonzalez got home, he realized he had a stab wound. He did not remember much of the evening because he was drunk.

The next day, Gonzalez discarded his bloody clothes in a dumpster. He did not intend to kill Hicks and "didn't plan for this to happen." Gonzalez believed his intoxication might have affected his judgment. He had had problems with anger for a long time, angered easily and sometimes took his anger out on others physically. He had been in quite a few fights. He had been the instigator of approximately 40 percent of those fights.

Psychiatrist John Greene evaluated Gonzalez in June 2012. Gonzalez

told Greene that he had problems with anger when he was a child and got into trouble as a result. In high school, he got into a couple of fights a year and started the fights about 40 percent of the time. After he graduated from high school, he was terminated from a job corps program for fighting. Gonzalez suffered from alcohol and methamphetamine abuse, which meant his repeated use had affected "his ability to behave appropriately when he [was] using those substances." Gonzalez reported using alcohol and marijuana at the time of his crime, and Greene believed intoxication was a factor in the offense and significantly impaired his memory. Selective memory impairment was common in people who drank substantial amounts of alcohol. A person with a history of anger issues and fighting might commit the offense here even without having consumed alcohol. Stress could also lead to misjudgment and rash actions.

Green's [sic] conclusions were based on what Gonzalez had reported. If Gonzalez was truthful about the amount of alcohol and marijuana he had consumed, his ability to think rationally would have been substantially impaired, and he "would most likely [have] act[ed] irrationally" and impulsively. Memory impairment was a mental illness, and testing strongly suggested Gonzalez "was not lying about symptoms of mental illness." Gonzalez's account to Green [sic] was consistent with what defense counsel had relayed to Green [sic] as Gonzalez's account to counsel; this supported Green's [sic] opinion that Gonzalez was truthful.

Defense counsel introduced video clips into evidence. A video taken inside the Hard Luck Tavern depicts three men entering through the front door. A blond woman moves toward them, gesturing and pushing one of them in the direction of the door. One of the men also gestures. The three men leave. A man, apparently Hicks, approaches the door after the men are outside. Within a minute, he looks toward the back door of the tavern, moves toward the back door and disappears from view. Within seconds, another man, apparently Gray, follows him quickly, holding an object, apparently the stun gun, and also disappears from view. Approximately one minute later, the blond woman, a brunette woman and a man run toward the back of the tavern and disappear from view. Within seconds, the brunette woman comes into view, running from the back door area toward the front of the tavern.

The defense also introduced into evidence a video taken outside the tavern. That video shows a paved area in the foreground and walls and parked cars in the background. Three people are seen running in the background, from left to right, one after the other. Almost immediately, a fourth person follows at a slower pace. A person comes into view on the right and moves toward the fourth person. The fourth person moves back slightly, stretches an arm toward the other person and moves his foot in a kicking motion, but does not touch

the other person. The other person moves toward the fourth person, the fourth person reciprocates, and they make contact. Standing close together, they move toward the left and out of view, as the other person hits the fourth person repeatedly. More people appear. There is a flash. Emergency vehicles arrive.

(Doc. No. 16-13, Lodgment No. 5 at 3-8.) In addition, the Court adopts the detailed discussion of the facts presented at Petitioner's trial set forth in the magistrate judge's R&R. (Doc. No. 62 at 4-13.)

## II.    Procedural History

On July 27, 2012, a jury convicted Petitioner of count one, attempted willful, deliberate and premeditated murder in violation of California Penal Code §§ 187(a) and 664, and of count two, assault with a deadly weapon in violation of California Penal Code § 245(a)(1). (Doc. No. 16-2, Lodgment No. 1 at CT 331-34.) The jury also returned true findings on the allegations, as to count one, that Petitioner personally used a deadly weapon (a knife) and inflicted great bodily injury that resulted in paralysis within the meaning of California Penal Code § 12022.7(a)-(b). (Id. at CT 332.) As to count two, the jury returned true findings on the allegations that Petitioner personally inflicted great bodily injury that caused the victim to suffer paralysis within the meaning of California Penal Code § 12022.7(a)-(b). (Id. at CT 333-34.) The trial court sentenced Petitioner to life in prison with the possibility of parole on count one, plus consecutive terms of five years for the great bodily injury finding and one year for the deadly weapon finding. (Doc. No. 16-3, Lodgment No. 1A at Supp. CT 5-8.) The trial court stayed Petitioner's sentence on count two. (Id. at 5.)

Petitioner appealed his conviction, arguing that (1) the evidence presented at trial was insufficient to support a conviction of attempted murder with premeditation and deliberation; (2) he received ineffective assistance of counsel because his trial counsel did not request a modified version of CALCRIM No. 522 instructing that provocation insufficient to reduce attempted murder to attempted voluntary manslaughter may support a finding that the attempted murder was not premeditated and deliberate; and (3) the trial

court violated Petitioner's right to a fair trial by refusing to let the jury review the video exhibits privately in the jury room during deliberation. (Doc. No. 16-11, Lodgment No. 3 at 17, 23, 29.) On February 26, 2014, the California Court of Appeal rejected Petitioner's arguments on the merits and affirmed the judgment. (Doc. No. 16-3, Lodgment No. 5.) Petitioner then filed a petition for review in the California Supreme Court raising the same claims. (Doc. No. 16-14, Lodgment No. 6.) On May 14, 2014, the California Supreme Court summarily denied the petition in an order stating, "The petition for review is denied." (Doc. No. 16-15, Lodgment No. 7.)

On August 3, 2015, Petitioner filed a habeas petition in Imperial County Superior Court. (Doc. No. 38-1, Lodgment No. 8.) In that petition, he argued that (1) the trial court erroneously admitted into evidence at trial Petitioner's "incriminating" statements to Dr. Greene, which were obtained without <u>Miranda</u> warnings, (<u>id.</u> at 4); (2) he received ineffective assistance of counsel because his trial counsel failed to object to Petitioner's statements to Dr. Greene as inadmissible under <u>Miranda</u>, (<u>id.</u> at 12); (3) he received ineffective assistance of counsel because his trial counsel failed to object to Bonesi's testimony regarding "pulling Petitioner off of the top of Hicks" and failed to request that the jury be instructed to disregard such testimony, (<u>id.</u> at 14); and (4) he received ineffective assistance of counsel because his trial counsel failed to request CALCRIM No. 626 regarding "voluntary intoxication causing unconsciousness," (<u>id.</u> at 21). On September 8, 2015, the Superior Court denied the petition because Petitioner failed to use the proper form that is "mandatory for self-represented inmates in the absence of a showing of good cause" and because Petitioner offered no explanation for why his petition was over one year late or why he did not raise his claims at trial or on appeal. (Doc. No. 38-2, Lodgment No. 9.)

On February 18, 2016, Petitioner filed a state habeas petition in the California Court of Appeal, alleging the same four claims he alleged in his habeas petition before the Superior Court as well as one additional claim: that he received ineffective assistance of counsel because his appellate counsel failed to raise the aforementioned four claims on

direct appeal. (Doc. No. 38-3, Lodgment No. 10 at 4, 13, 15, 21, 26.) Petitioner also claimed that the Superior Court abused its discretion by denying his petition as untimely. (Id. at 28.) On February 26, 2016, the Court of Appeal denied the petition, concluding that the petition was procedurally barred as untimely and that Petitioner's <u>Miranda</u>-based claims were barred because Petitioner failed to raise them on direct appeal. (Doc. No. 38-4, Lodgment No. 11 at 2.) In the alternative, the Court of Appeal denied the petition on the merits. (Id. at 2-3.) On March 21, 2016, Petitioner filed a state habeas petition in the California Supreme Court. (Doc. No. 38-5, Lodgment No. 12.) On June 8, 2016, the California Supreme Court denied the petition with an order stating "Petition for writ of habeas corpus denied." (Doc. No. 38-6, Lodgment No. 13.)

On August 24, 2015—that is, after Petitioner filed his state habeas petition in Imperial County Superior Court but before the Superior Court denied that petition—the Petitioner filed a federal habeas petition and a motion to stay in this Court. (Docs. No. 1, 2.) In his federal habeas petition, Petitioner alleged the same three claims that he had alleged on direct appeal. (Doc. No. 1 at 9, 16, 24.)

On June 13, 2016, the Court denied as moot Petitioner's motion for stay because Petitioner had exhausted his state court remedies. (Doc. No. 27.) The Court also granted Petitioner leave to file an amended petition containing all exhausted claims. (Id.) On June 20, 2016, Petitioner filed his first amended petition. (Doc. No. 28.) On June 24, 2016, Petitioner filed amendments to his habeas corpus petition. (Doc. No. 30.) On August 22, 2016, Respondent filed an answer to the first amended petition. (Doc. No. 37.) On December 13, 2016, Petitioner filed a traverse. (Doc. No. 50.)

## DISCUSSION

### I.    Legal Standards for 28 U.S.C. § 2254 Habeas Petition

A federal court may review a petition for writ of habeas corpus by a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); see <u>Swarthout v. Cooke</u>, 562 U.S. 216, 219 (2011) ("[F]ederal habeas corpus relief does

not lie for errors of state law." (quoting Estelle v. McGuire, 502 U.S. 62, 67 (1991)) (internal quotation marks omitted)). "Habeas corpus is an 'extraordinary remedy' available only to those 'persons whom society has grievously wronged . . . .'" Juan H. v. Allen, 408 F.3d 1262, 1270 (9th Cir. 2005) (quoting Brecht v. Abrahamson, 507 U.S. 619, 633-34 (1993)). Because Petitioner filed the present petition after April 24, 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the petition. See Lindh v. Murphy, 521 U.S. 320, 322-23 (1997); Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004) (en banc).

Under AEDPA, a petition for writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim":

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Cullen v. Pinholster, 563 U.S. 170, 181 (2011). "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Pinholster, 563 U.S. at 181 (citations omitted). "Section 2254(d) thus demands an inquiry into whether a prisoner's 'claim' has been 'adjudicated on the merits' in state court; if it has, AEDPA's highly deferential standards kick in." Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015). "The petitioner carries the burden of proof." Pinholster, 563 U.S. at 181.

Under § 2254(d)(1), a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The Supreme Court has explained that "§ 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning.'" Bell v. Cone, 535 U.S. 685, 694 (2002); see Williams v. Taylor, 529 U.S. 362, 404-05 (2000) (distinguishing the "contrary to" and the

"unreasonable application" standards). "A state-court decision is 'contrary to' [the Supreme Court's] clearly established precedents if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (quoting <u>Williams</u>, 529 U.S. at 405-06). A state court decision is "an unreasonable application" of the Supreme Court's clearly established precedent if "the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Williams</u>, 529 U.S. at 407. Under the "unreasonable application" prong, "the state court's decision must have been more than incorrect or erroneous;" the state court's application of the relevant precedent must have been objectively unreasonable. <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003); <u>see</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 76 (2003); <u>see also</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.").

"Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" <u>Lockyer</u>, 538 U.S. at 71; <u>see also</u> <u>Parker v. Matthews</u>, 132 S. Ct. 2148, 2155 (2012) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'"). Further, "review under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." <u>Pinholster</u>, 563 U.S. at 181.

Under § 2254(d)(2), a federal court may grant habeas relief only if the state court's decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Under this provision,

"a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010) ("[E]ven if [r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." (internal quotation marks and citation omitted)). "Instead, § 2254(d)(2) requires that [the federal habeas court] accord the state trial court substantial deference." Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015).

In conducting an analysis under AEDPA, the federal habeas court looks to the last reasoned state-court decision. Castellanos v. Small, 766 F.3d 1137, 1145 (9th Cir. 2014); Murray v. Schriro, 745 F.3d 984, 996 (9th Cir. 2014). Where there is an unexplained decision from the state's highest court, the federal habeas court "looks through" to the last reasoned state court decision and presumes that the unexplained opinion rests upon the same ground. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991); see, e.g., Brumfield, 135 S. Ct. at 2276. Where no state-court decision furnishes a basis for the state court's underlying reasoning, the court must engage in an independent review of the record and ascertain whether the state court's decision was objectively unreasonable. Castellanos, 766 F.3d at 1145; see also Richter, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

In addition, even if a federal habeas petitioner has established that a constitutional error occurred, the petitioner is not entitled to habeas relief based on a trial error unless the petitioner can establish that the error "resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637; accord Ayala, 135 S. Ct. at 2197. "Under that standard, an error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." Fry v. Pliler, 551 U.S. 112, 116 (2007) (internal quotation marks and citation omitted). Further, "[t]here must be more than a 'reasonable possibility' that the error was harmful." Ayala, 135 S. Ct. at 2198.

A district court "may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate." 28 U.S.C. § 636(b)(1); accord Fed. R. Civ. P. 72(b)(3). If a party objects to any portion of the magistrate's report, the district court reviews de novo those portions of the report. Id.; see also United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) ("The statute makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise." (emphasis in original)).

## II. Petitioner's Claims

### 1. Insufficiency of Evidence Claim

Petitioner challenges his conviction of attempted murder on the ground that the evidence presented at trial was insufficient to support a finding of premeditation and deliberation. (Doc. No. 28 at 9-14.) He argues that no reasonable juror would have found that he acted with premeditation and deliberation when he attempted to kill Hicks because "[t]he evidence at best" showed that Petitioner "was very intoxicated[ and] stabbed Hicks as a spontaneous, rash and impulsive act, without careful consideration of that choice or its consequences, after Hicks yelled at him, kicked and punched him in the head." (Id. at 9-10.)

This claim was raised on direct appeal and denied by the state courts. (See Doc. Nos. 16-12, 16-13, 16-14, 16-15, Lodgment Nos. 4, 5, 6, 7.) Thus, in conducting habeas review, the Court looks through the California Supreme Court's summary denial of Petitioner's petition for review and evaluates the California Court of Appeal's reasoned decision denying Petitioner's insufficiency of evidence claim. See, e.g., Brumfield, 135 S. Ct. at 2276.

### A. Standard of Review

Jackson v. Virginia, 443 U.S. 307 (1979), sets forth the standard for a federal habeas court to review the sufficiency of evidence. The Due Process Clause of the Fourteenth Amendment prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. See id. Under Jackson, a habeas petitioner challenging the sufficiency of the evidence to support his state criminal conviction may obtain relief only

if "it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324. Therefore, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.

"Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam). First, on direct appeal, a reviewing court may only set aside the jury's verdict on the ground of insufficient evidence if no rational trier of fact could have agreed with the jury. See Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam). Second, on collateral review, a federal court can only overturn a state court's decision rejecting a sufficiency of the evidence challenge if the state court's decision was objectively unreasonable, but may not do so simply because the federal court disagrees with the state court. See id. at 2. The Ninth Circuit also adopts an additional degree of deference when applying Jackson's standard on sufficiency of evidence in habeas petitions. See Boyer v. Belleque, 659 F.3d 957, 964-65 (9th Cir. 2011); Juan H., 408 F.3d at 1274.

In applying Jackson's standard, federal courts must look to state law for the substantive elements of the criminal offense. See 443 U.S. at 324 n.16. California law provides that "willful, deliberate, and premeditated murder . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." Cal. Penal Code § 664(a). "[D]eliberation refers to careful weighing of considerations in forming a course of action," while "premeditation" means "thought over in advance." People v. Pearson, 297 P.3d 793, 836 (Cal. 2013) (internal quotation marks and citations omitted). "Deliberation" and "premeditation" require "more reflection than may be involved in the mere formation of a specific intent to kill," People v. Anderson, 447 P.2d 942, 948 (Cal. 1968), but the prosecution need not "prove the defendant maturely and meaningfully reflected upon the gravity of his or her act," Cal. Penal Code § 189. "The process of premeditation and deliberation does not require any extended period of time"; the issue "is not the duration

of time as much as it is the extent of the reflection," as "[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." People v. Koontz, 46 P.3d 335, 361 (Cal. 2002).

### B. Analysis

Here, Petitioner argues that there is insufficient evidence to support his conviction of attempted willful, deliberate, and premeditated murder. (Doc. No. 28 at 13.) He contends that, based on the trial evidence, no reasonable trier of fact would find that he "deliberated and premeditated killing Hicks." (Id.) The evidence, according to Petitioner, shows that the stabbing resulted from "impaired judgment brought about by voluntary intoxication" and from provocation in the form of Hicks cursing at Petitioner—who was in the process of running away—and kicking and punching Petitioner. (Id.) In conducting habeas review, this Court looks to the substantive requirements of California state law and evaluates the objective reasonableness of the California Court of Appeal's sufficiency of the evidence determination under Jackson. See 443 U.S. at 319, 324 n.16. Thus, for Petitioner to prevail on his claim, the evidence in the record must be such that no reasonable trier of fact could find that Petitioner's attempt to kill Hicks was committed with deliberation and premeditation.

The California Court of Appeal succinctly determined that a reasonable jury could have "conclude[d] that in a short period of time, before he attacked Hicks, Gonzalez considered the circumstances and, after reflection, decided to kill Hicks." (Doc. No. 16-13, Lodgment No. 5 at 10.) A rational jury could have believed Hicks's and Gray's version of the events and rejected Petitioner's version. (Id.)

Affording due respect to the fact-finding role of the jury and the state court's judgment, this Court concludes that the evidence at Petitioner's trial is sufficient to establish that Petitioner committed attempted murder with deliberation and premeditation. See Beltran, 56 Cal. 4th at 942. On the basis of the trial evidence, and on Hicks's testimony in particular, a rational jury could find that Petitioner ran away after throwing the rock at the Tavern's back door, came back when Hicks said something to Petitioner and his friends,

like "Why Christmas? Why throw the boulder," and then chose to attack Hicks, stabbing him with a knife. (Doc. No. 16-4, Lodgment No. 2 at RT 156-59.) A rational jury could infer that, in doing so, Petitioner carefully weighed the considerations for and against his choice, understood the consequences, and then quickly made the decision to kill Hicks. See Anderson, 447 P.2d at 949. A rational jury could also have discredited Petitioner's testimony that he was severely intoxicated and that he was somehow provoked into attacking Hicks because Hicks yelled at, kicked, and punched Petitioner, or because Mr. Gray threatened Petitioner with a stun gun. (Doc. No. 16-7, Lodgment No. 2 at RT 476-78.) On habeas review, the Court must respect the fact-finder's witness-credibility determinations and weighing of the evidence. See Jackson, 443 U.S. at 319. As a result, the Court concludes that there is sufficient evidence as required by due process to support Petitioner's conviction and that the California Court of Appeal's decision is a reasonable application of the Jackson standard. Accordingly, the Court denies Petitioner's claim on the merits.

### 2. **Miranda** Violation Claim

Petitioner alleges that his right against self-incrimination was violated because the jury heard evidence of non-Mirandized statements he made while in custody to psychiatrist Dr. Greene. (Doc. No. 28 at 32.) He contends Dr. Greene was appointed by the trial court to evaluate Petitioner and did so while Petitioner was "handcuffed to a secure table" in jail. (Id.) Although Dr. Greene told Petitioner "before their extensive interview" that Petitioner "would not enjoy the same level of confidentiality as a regular patient," Dr. Greene never informed Petitioner of his Miranda rights or obtained a valid waiver of those rights.[1] (Id.)

This claim was raised in Petitioner's state habeas petition, which the state courts

---

[1] Relatedly, Petitioner contends that he was coerced into testifying at his trial, without having been informed of his Miranda rights, because he was "under extreme psychological pressure, facing a life sentence, never being offerd [sic] any type of deal" and was pressured by his trial counsel to speak with Dr. Greene and to testify at trial. (Doc. No. 28 at 34.) "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994). Accordingly, the Court denies this claim on the merits.

denied. (See Doc. Nos. 38-1, 38-2, 38-3, 38-4, 38-5, 38-6, Lodgment Nos. 8, 9, 10, 11, 12, 13.) The Imperial County Superior Court denied this claim on procedural grounds, (Doc. No. 38-2, Lodgment No. 9), as did the Court of Appeal, but the latter alternatively denied the claim on the merits, (Doc. No. 38-4, Lodgment No. 11). The California Supreme Court summarily denied the claim. (See Doc. No. 38-6, Lodgment No. 13.)

Conducting habeas review, the Court looks through the California Supreme Court's summary denial of Petitioner's petition for review and evaluates the California Court of Appeal's reasoned decision denying Petitioner's Miranda violation claim. See, e.g., Brumfield, 135 S. Ct. at 2276.

### A. Standard of Review

"The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" Estelle, 451 U.S. at 462. Accordingly, the Supreme Court held in Miranda that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). "The sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion." Colorado v. Connelly, 479 U.S. 157, 170 (1986).

"[W]hen a criminal defendant 'neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence,' his compelled statements to a psychiatrist cannot be used against him." Kansas v. Cheever, 134 S. Ct. 596, 600 (2013) (quoting Estelle, 451 U.S. at 468). But "where a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal." Id. (discussing Buchanan v. Kentucky, 483 U.S. 402 (1987)). Such rebuttal evidence includes "evidence from the reports of the examination that the defendant requested." Buchanan, 483 U.S. at 422-23.

//

**B. Analysis**

Denying this claim, the Court of Appeal determined that:

> Even if Gonzalez's claims were not procedurally barred, they would be rejected on the merits. The claims based on alleged failure to provide *Miranda* warnings are frivolous. Such warnings are required only in the context of "custodial interrogation," which means "questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda*, *supra*, 384 U.S. at p. 444, italics added.) Dr. Greene was retained by defense counsel to examine Gonzalez to determine whether any psychiatric problems, including intoxication, contributed to the crimes with which he was charged. Gonzalez presents no evidence Dr. Greene was working for law enforcement. "Absent evidence of complicity on the part of law enforcement officials, the admissions or statements of a defendant to a private citizen infringe no constitutional guarantees." (*People v. Mangiefico* (1972) 25 Cal.App.3d 1041, 1049.) In any event, once Gonzalez introduced testimony from Dr. Greene on the intoxication defense, the prosecutor was permitted to introduce evidence of statements Gonzalez made about the crimes during his examination by Dr. Greene. (*Kansas v. Cheever* (2013) 571 U.S. __, __ [134 S.Ct. 596, 602].)

(Doc. No. 38-4, Lodgment No. 11 at 2.)

The California Court of Appeal's determination that the admission of Petitioner's statements to Dr. Greene did not violate Petitioner's <u>Miranda</u> rights was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Nor was the Court of Appeal's decision an unreasonable determination of facts in light of the evidence. First, the Court of Appeal reasonably concluded that Petitioner's statements to Dr. Greene, a psychiatrist apparently retained as a defense expert, did not implicate <u>Miranda</u>. And second, because the defense called Dr. Greene to testify about his evaluation of Petitioner, Petitioner had no Fifth Amendment privilege against the prosecution's use of psychiatric evidence in rebuttal. <u>See</u> <u>Buchanan</u>, 483 U.S. at 422-23. The defense called Dr. Greene to give expert testimony as to Petitioner's mental state at the time of the attack. (<u>See</u>, <u>e.g.</u>, Doc. No. 16-7, Lodgment 2 at RT 553 ("I was asked to determine if there were any issues of mental illness related to his instant offenses.").) Dr. Greene testified regarding, inter alia, Petitioner's adolescent mental health and substance abuse history. (<u>Id.</u>

at RT 554-55.) Dr. Greene also opined that Petitioner had impaired judgment and impaired memory when he attacked Hicks, (id. at RT 559-60), and that a person who had consumed as much alcohol as Petitioner claimed to have consumed before attacking Hicks would have "substantially impaired" ability for rational thinking, (id. at RT 565). Once the defense introduced this psychiatric evidence, which bore on whether Petitioner had the requisite mental state for the charged offense when he attacked Hicks, the prosecution was permitted to present psychiatric evidence in rebuttal, see Buchanan, 483 U.S. at 422-23, which it did during cross-examination of Dr. Greene and of Petitioner. Accordingly, the Court denies Petitioner's claim on the merits.[2]

### 3. Ineffective Assistance of Counsel Claims

Petitioner alleges that, in several respects, he was provided with ineffective assistance of counsel ("IAC") in violation of the Sixth Amendment. (Doc. No. 28 at 16, 41, 43, 49, 54.) The Court addresses each IAC claim in turn.

### A. Legal Standards for § 2254 Ineffective Assistance of Counsel Claims

The Sixth Amendment entitles criminal defendants to the effective assistance of counsel at all critical stages of a criminal proceeding. Lafler v. Cooper, 132 S. Ct. 1376, 1385-86 (2012). In order to prove a Sixth Amendment ineffective assistance of counsel claim, the petitioner must establish (1) that counsel's performance was deficient, and (2) that he was prejudiced by counsel's deficient performance. Strickland v. Washington, 466 U.S. 668, 688, 692 (1984); Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).

In order to satisfy the first prong of the test, the petitioner must show his counsel's performance "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. "Judicial scrutiny of counsel's performance must be

---

[2] Because the Court denies the claim on the merits, the Court need not reach the issue of procedural default. (See Doc. No. 62 at 32-38.) See Flournoy v. Small, 681 F.3d 1000, 1004 n.1 (9th Cir. 2012) (holding that a court may reach the merits of a habeas claim despite an asserted procedural bar when the claim "clearly fails on the merits"); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (same).

highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also Padilla v. Kentucky, 559 U.S. 356, 371 (2010) ("Surmounting Strickland's high bar is never an easy task.").

In order to satisfy the prejudice prong of the test, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

In evaluating an ineffective assistance of counsel claim raised in a § 2254 habeas petition, a federal habeas court must "take a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'" Pinholster, 563 U.S. at 190 (citations omitted); see also Richter, 562 U.S. at 105 ("The standards created by Strickland and § 2254(d) are both 'highly deferential.'"). Thus, a federal habeas court's review of an ineffective assistance of counsel claim in a § 2254 habeas petition is "'doubly deferential.'" Pinholster, 563 U.S. at 190. The reviewing court must determine "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

### B. IAC Claim Raised on Direct Appeal - Trial Counsel's Failure to Request Modified Version of CALCRIM No. 522

Petitioner argues his trial counsel was ineffective due to his failure to request a modified version of CALCRIM No. 522 that provocation could "negate the mental state of premeditation and deliberation." (Doc. No. 28 at 17.) Petitioner claims that it was prejudicial error to not request such an instruction because "there was ample evidence from which the jury could have concluded that Petitioner acted rashly due to provocation and did not premeditate and deliberate killing Hicks before stabbing him repeatedly." (Id.)[3]

---

[3] The current version of CALCRIM No. 522 provides, "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the

This particular IAC claim was raised on direct appeal and denied by the state courts. (See Doc. Nos. 16-12, 16-13, 16-14, 16-15, Lodgment Nos. 4, 5, 6, 7.) Thus, in conducting habeas review, the Court looks through the California Supreme Court's summary denial of Petitioner's petition for review and evaluates the California Court of Appeal's reasoned decision denying Petitioner's IAC claim. See, e.g., Brumfield, 135 S. Ct. at 2276. The relevant portions of the California Court of Appeal's decision are as follows:

> Defense counsel argued that Hicks provoked Gonzalez by yelling, cursing and landing the first blow; Gonzalez acted because of a sudden quarrel and in the heat of passion; he was so intoxicated he acted rashly and without thinking; and this was a case of imperfect self-defense. At counsel's request, the court instructed the jury on the lesser included offense of attempted voluntary manslaughter if "[t]he defendant attempted to kill someone because of a sudden quarrel or in the heat of passion" and "because he was provoked" (CALCRIM No. 603) and on complete and imperfect self-defense (CALCRIM Nos. 505, 604). The court also instructed the jury could "consider evidence of voluntary intoxication in deciding if the People had proved . . . deliberation and premeditation" (CALCRIM No. 3426) and that "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated" (CALCRIM No. 601). Gonzalez contends counsel was ineffective because he did not request a modified version of CALCRIM No. 522, instructing that provocation insufficient to reduce attempted murder to attempted voluntary manslaughter may nevertheless support a finding that the attempted murder was not premeditated and deliberate.

> The defendant has the burden of showing he received ineffective assistance of counsel, that is, that counsel did not act in a manner expected of a reasonably competent attorney and counsel's act or omissions prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692.) To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at 694.)

> Here, there was no substantial evidence of provocation; the evidence was, at most, "minimal and insubstantial." (*People v. Middleton* (1997) 52 Cal.App.4th 19, 33.) The record does not demonstrate the lack of a request for

---

provocation, if any, are for you to decide. If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

a modified version of CALCRIM No. 522 caused Gonzalez any prejudice. (See *People v. Koontz*, *supra*, 27 Cal.4th at pp. 1085-1086.) This defeats his contention of ineffective assistance of counsel.

(Doc. No. 16-13, Lodgment No. 5 at 10-11.)

The California Court of Appeal's decision reasonably applied <u>Strickland</u>, the Supreme Court's clearly established precedent governing ineffective assistance of counsel claims under the Sixth Amendment. Specifically, the Court of Appeal reasonably concluded that Petitioner failed to satisfy <u>Strickland</u>'s prejudice prong because the modified version of CALCRIM No. 522 would not have affected the outcome of his trial.

The only evidence that supported the defense theory of provocation was Petitioner's testimony, which was internally inconsistent and inconsistent with Hick's and Gray's testimonies. For example, Petitioner testified that he didn't remember why he stopped running away from the Tavern and returned to confront Hicks, but also testified that Hicks provoked him to return by calling him a "motherfucker." (Doc. No. 16-7, Lodgment No. 2 at RT 475-76.) Hicks, for his part, testified that he said something to Petitioner and Petitioner's companions like, "Why Christmas? Why throw the boulder?" (Doc. No. 16-4, Lodgment No. 2 at RT 157.) Petitioner further testified that he only pulled out his knife after Hicks hit him, (Doc. No. 16-7, Lodgment No. 2 at RT 477), while Hicks testified that Petitioner ran at him, there was "maybe contact," Petitioner hugged him, and stabbed him in the back in the process, (Doc. No. 16-4, Lodgment No. 2 at RT 158-59). The video evidence indicates that, although Hicks stretched an arm toward Petitioner and moved his foot "in a kicking motion," he did not initiate contact with Petitioner. (Doc. No. 16-13, Lodgment No. 5 at 8.) As the Court of Appeal reasonably found when denying Petitioner's sufficiency of the evidence claim, "[a] rational jury could have accepted Hicks's version of events and rejected Gonzalez's version." (<u>Id.</u> at 10.) Similarly, Petitioner testified that the presence of Gray standing behind Hicks and holding a weapon prompted him to pull out his knife and attack Hicks, (Doc. No. 16-7, Lodgment No. 2 at RT 476), but Gray testified that Petitioner was already stabbing Hicks, who was lying on the ground, by the

time Gray came out of the Tavern with the stun gun, (Doc. No. 16-4, Lodgment No. 2 at RT 181-83).

The Court of Appeal's conclusion that the evidence of provocation was "minimal and substantial" is a reasonable determination of the facts. Moreover, the trial court did instruct the jury on provocation as it related to Petitioner's heat of passion defense, which could have reduced his crime to attempted voluntary manslaughter. Thus, this case does not raise concerns about the jury being presented with only two options—"convicting on a single charged offense or acquitting the defendant altogether"—and likely "resolv[ing] its doubts in favor of conviction." Crace v. Herzog, 798 F.3d 840, 848 (9th Cir. 2015) (quoting Keeble v. United States, 412 U.S. 205, 212-13 (1973)).

In sum, the Court of Appeal reasonably applied Strickland's prejudice prong when it concluded that Petitioner suffered no prejudice from his trial counsel's failure to request the modified CALCRIM No. 522 instruction. Petitioner has not shown a reasonable probability that, had his counsel requested such an instruction, the outcome of trial would have been different (e.g., the jury would have found him guilty of first degree attempted murder that was not premeditated and deliberate). Accordingly, the Court denies this claim on the merits.

### C. IAC Claims Raised in State Habeas Proceedings

The following IAC claims were each raised in Petitioner's state habeas petition, which the state courts denied. (See Doc. Nos. 38-1, 38-2, 38-3, 38-4, 38-5, 38-6, Lodgment Nos. 8, 9, 10, 11, 12, 13.) The Imperial County Superior Court denied these claims on procedural grounds, (Doc. No. 38-2, Lodgment No. 9), as did the Court of Appeal, but the latter alternatively denied the claims on the merits, (Doc. No. 38-4, Lodgment No. 11). The California Supreme Court summarily denied the claims. (See Doc. No. 38-6, Lodgment No. 13.)

Conducting habeas review, the Court looks through the California Supreme Court's summary denial of Petitioner's petition for review and evaluates the California Court of Appeal's reasoned decision denying Petitioner's IAC claims. See, e.g., Brumfield, 135 S.

Ct. at 2276.

### a. Trial Counsel's Failure to Object to Petitioner's Statements to Dr. Greene as Inadmissible under Miranda

Petitioner claims that his trial counsel was ineffective because he failed to object to admission of Petitioner's statements to Dr. Greene. (Doc. No. 28 at 41.) Dr. Greene testified to Petitioner's "incriminating statements regarding the circumstance surrounding the confrontation with Hicks and Gray, the stabbing, and several highly prejudicial factors from petitioner's history." (Id.) This evidence served as direct and impeachment evidence. (Id.)

The Court of Appeal denied this claim, having previously found no violation of Petitioner's right against self-incrimination through admission of Petitioner's statements to Dr. Greene. The Court of Appeal determined:

> Because a *Miranda* objection to introduction of the statements in Dr. Greene's psychiatric report would properly have been overruled, Gonzalez's trial counsel did not provide ineffective assistance by failing to make the objection. (See, e.g., *People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile."].)

(Doc. No. 38-4, Lodgment No. 11 at 2.)

The Court of Appeal's denial of this IAC claim was not contrary to, or an unreasonable application of, clearly established federal law. The Court of Appeal reasonably concluded that Petitioner's statements to Dr. Greene did not implicate Miranda because Dr. Greene was a defense expert. (Doc. No. 38-4, Lodgment No. 11 at 2.) The Court of Appeal also reasonably determined that, because the defense introduced psychiatric evidence bearing on whether Petitioner had the requisite mental state for the charged offense, the prosecution was permitted to introduce in rebuttal Petitioner's statements to Dr. Greene. See Buchanan, 483 U.S. at 422-23. Thus, because the trial court would have properly overruled an objection to Petitioner's statements, the Court of Appeal reasonably applied Strickland and concluded that Petitioner's trial counsel was not

ineffective for failing to make a futile objection. The Court denies this claim on the merits.[4]

### b. Trial Counsel's Failure to Object to Testimony that Bonesi "Pulled" or "Lifted" Petitioner Off Victim

Petitioner next claims his trial counsel was ineffective because he failed to object to admission of testimony that Bonesi pulled or lifted Petitioner off Hicks during the attack. (Doc. No. 28 at 43.) This testimony was improper opinion evidence, Petitioner contends, that was also speculative and lacked foundation. (Id. at 45.) In addition, Petitioner argues that the prosecution improperly repeated this statement during open and closing arguments, direct-examination of Gray, and cross-examination of Petitioner and Bonesi. (Id. at 43-44.) By failing to object, trial counsel permitted the statement to "develope [sic] into a fact" that "was a big part of prosecution's case to get conviction of Attempted Murder." (Id. at 45.) Petitioner further argues that trial counsel should have requested that the court admonish the jury to disregard the improper statements. (Id.)

The Court of Appeal succinctly denied this claim, determining that:

> As for the failure of trial counsel to object to statements of the prosecutor and witnesses that Gonzalez was pulled off the victim, Gonzalez neither identifies any basis for a meritorious objection nor explains how the exclusion of those statements would have led to a better outcome.

(Doc. No. 38-4, Lodgment No. 11 at 3.)

The Court of Appeal's denial of this IAC claim was not contrary to, or an unreasonable application of, clearly established federal law. Bonesi testified that, after observing Petitioner sitting on Hicks's legs or stomach, Bonesi approached and "kind of tapped [Petitioner] on the shoulder" as Petitioner "was already getting up." (Doc. No. 16-5, Lodgment No. 2 at RT 337.) He also testified that he gave Petitioner "sort of a little push" once they began running away from the scene," (id. at RT 338), and that the video shows him "throwing [Petitioner] ahead of [him]" and the two of them running off, (id. at

---

[4] Because the Court denies the claim on the merits, the Court need not reach the issue of procedural default. (See Doc. No. 62 at 32-38.)

RT 339).

Gray, for his part, testified on direct examination that he saw Bonesi "tug[] on [Petitioner's] shirt, the back of his shirt" and that Bonesi, Petitioner, and Murillo then ran off. (Doc. No. 16-4, Lodgment No. 2 at RT 185.) On cross-examination, Gray testified that Bonesi "grabbed Mr. Gonzalez and tried to pull him off." (Id. at RT 204; see also id. at RT 205 (testifying on cross-examination that he saw Bonesi "pull [Petitioner] from the back").) Gray's testimony was neither speculative, lacking in foundation, nor improper opinion evidence; rather, it was based on his first-hand observations at the time of the attack. Considering the futility of objecting to Gray's testimony, Petitioner has not shown that his counsel's failure to object "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Nor has Petitioner shown a reasonable probability that, had his trial counsel objected to this admissible testimony or to the prosecution's mention of it during opening and closing arguments, the result of his trial would have been different. Id. at 694.

Petitioner takes particular issue with the prosecution's statements during closing argument that Petitioner "didn't stop [stabbing Hicks] on his own," that "[h]e was stopped" by Bonesi and Gray, and that if Bonesi and Gray hadn't shown up when they did, "[w]ho knows if this wouldn't be murder instead of attempted murder." (Doc. No. 16-8, Lodgment No. 2 at RT 697.) But "prosecutors are free to argue reasonable inferences from the evidence." See United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989) (citation omitted). Although Bonesi did not testify that he made physical contact with Bonesi in order to stop Petitioner from continuing to attack Hicks, Bonesi's and Gray's testimonies gave rise to the reasonable inference that Bonesi did so for that purpose. For the same reason, there was no error in the prosecution's statement during opening argument that the evidence would show Bonesi "simultaneously grabbed Mr. Gonzalez and pulled him off so that the stabbing stopped." (Doc. No. 16-4, Lodgment No. 2 at RT 148.).

Thus, Petitioner has not shown a reasonable probability that the outcome of his trial would have been different had his trial counsel objected to the testimony and statements at issue. Accordingly, the Court of Appeal's determination that Petitioner failed to satisfy

*Strickland*'s prejudice prong was reasonable in light of the record before the state court and was neither contrary to, nor an unreasonable application of, clearly established federal law. The Court denies this claim on the merits.[5]

### c. Trial Counsel's Failure to Request Modified Version of CALCRIM No. 626

Petitioner also claims his trial counsel was ineffective because he failed to request a modified version of CALCRIM No. 626 regarding voluntary intoxication causing unconsciousness.[6] (Doc. No. 28 at 49.) Acknowledging that the jury did receive CALCRIM No. 3426 (Voluntary Intoxication)—which provides that the jury "may consider evidence, if any, of the defendant's voluntary intoxication . . . only in deciding whether the defendant acted [or failed to do an act] with" the specific intent or mental state required for the charged offense—Petitioner asserts that CALCRIM No. 3426 did "not take into account that [Petitioner] may have been unconscious[] when he acted." (Id. at 51.) He argues that Bonesi's, Dr. Greene's and Petitioner's testimonies supplied evidence that Petitioner was "blacked out" during the attack and that it is therefore "very likely" that giving a modified version of CALCRIM No. 626 would have affected the verdict, "specifically [] the premeditated element of attempted murder." (Id.)

_____

[5] Because the Court denies the claim on the merits, the Court need not reach the issue of procedural default. (See Doc. No. 62 at 43.)
[6] CALCRIM No. 626 states that:

> Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement but may not be aware of his or her actions or the nature of those actions.

> A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

> When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.

The Court of Appeal denied this claim, finding that:

> As for the failure of trial counsel to request a jury instruction on unconsciousness due to voluntary intoxication (CALCRIM No. 626), Gonzalez identifies no substantial evidence he was unconscious when he repeatedly stabbed the victim. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 424 [no duty to instruct on unconsciousness due to voluntary intoxication when there "was no *quantum satis* of evidence to warrant an instruction"].) It also does not appear the failure to request the instruction caused any prejudice, for the jury found Gonzalez guilty of willful, deliberate, and premeditated attempted murder even though other instructions (CALCRIM No. 601 & 3426) advised the jury his voluntary intoxication could have prevented the deliberation and premeditation required to find him guilty.

(Doc. No. 38-4, Lodgment No. 11 at 3.)

The Court of Appeal's denial of this IAC claim was reasonable in light of the record before the state court and was neither contrary to, nor an unreasonable application of, clearly established federal law. More specifically, the Court of Appeal reasonably concluded that Petitioner had not satisfied Strickland's prejudice prong. The trial court did instruct the jury, pursuant to CALCRIM No. 3426, that it could "consider evidence of voluntary intoxication in deciding if the people have proved the allegation that the attempted murder was done willfully and with deliberation and premeditation." (Doc. No. 16-8, Lodgment No. 2 at RT 671.) This instruction explicitly addressed the issue of voluntary intoxication as it bore on Petitioner's mental state at the time of the attack. Moreover, the only evidence possibly suggesting that Petitioner "blacked out" during the attack is Petitioner's and Bonesi's accounts of Petitioner's alcohol consumption and Petitioner's testimony that he didn't remember stabbing Hicks after the first blow. But Petitioner points to no evidence in the record that "blacked out" is the equivalent of unconsciousness. In addition, although the defense expert, Dr. Greene, testified that Petitioner had impaired judgment and impaired memory when he attacked Hicks, (Doc. No. 16-7, Lodgment No. 2 at RT 559-60), and that a person who had consumed as much alcohol as Petitioner claimed to have consumed before attacking Hicks would have "substantially impaired" ability for rational thinking, (id. at RT 565), Dr. Greene did not

testify that Petitioner was likely unconscious during the attack. Therefore, the Court of Appeal reasonably determined that Petitioner identified no substantial evidence that he was unconscious when he stabbed Hicks fifteen times.

In sum, Petitioner has not shown a reasonable probability that, if the jury had received a modified version of CALCRIM No. 626 explaining that voluntary intoxication may cause unconsciousness, then the outcome of his trial would have been different and, specifically, that the jury would not have found premeditation. The Court of Appeal's determination was neither contrary to, nor an unreasonable application of, clearly established federal law. The Court denies this claim on the merits.[7]

### d. Appellate Counsel's Failure to Raise Claims on Appeal

With respect to Petitioner's claim that his appellate counsel was ineffective, Petitioner has failed to identify a non-frivolous issue that his appellate counsel could have raised on direct appeal. All of the claims raised in his federal habeas petition and in Petitioner's other federal filings fail on the merits. Therefore, Petitioner has failed to establish that his appellate counsel's performance was objectively unreasonable or that Petitioner was prejudiced by his appellate counsel's actions. See Smith v. Robbins, 528 U.S. 259, 285 (2000) (explaining that to succeed on a claim that appellate counsel was ineffective, the petitioner must show that his "counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them"); Moormann v. Ryan, 628 F.3d 1102, 1107 (9th Cir. 2010) (explaining that appellate counsel does not act unreasonably "in failing to raise a meritless claim" and a petitioner is not prejudiced by the failure to raise a meritless claim); Sexton v. Cozner, 679 F.3d 1150, 1157 (9th Cir. 2012) ("[W]e cannot hold counsel ineffective for failing to raise a claim that is meritless."). Accordingly, the Court denies Petitioner's claim that his appellate counsel was ineffective.[8]

---

[7] Because the Court denies the claim on the merits, the Court need not reach the issue of procedural default. (See Doc. No. 62 at 46.)

[8] Because the Court denies the claim on the merits, the Court need not reach the issue of procedural default. (See Doc. No. 62 at 48.)

### 4. Jury Trial and Fair Trial Claim Regarding Video Exhibits

Petitioner alleges violations of his right to a jury trial and to a fair trial under the Sixth and Fourteenth Amendments, based on the trial court's refusal to allow the jury to review the video exhibits privately in the jury room during deliberation. (Doc. No. 28 at 24.) He contends that the "video evidence was not crystal clear and needed close examination," and the court didn't permit the jury "to stop and rewind and then replay the key parts while at the same time being able to discuss openly and without reservation what they saw." (Id. at 26, 30.) The trial court's "error," Petitioner argues, "prevented the jurors from deliberating and evaluating the evidence in a meaningful manner and the playing the exhibits in open court prevented the jurors from deliberating in private while reviewing the evidence." (Id. at 26.)

Petitioner raised this claim on direct appeal and the state courts denied it. (See Doc. Nos. 16-12, 16-13, 16-14, 16-15, Lodgment Nos. 4, 5, 6, 7.)). Thus, in conducting habeas review, the Court looks through the California Supreme Court's summary denial and evaluates the California Court of Appeal's reasoned decision denying Petitioner's jury trial and fair trial claim. See, e.g., Brumfield, 135 S. Ct. at 2276.

The California Court of Appeal's opinion provided the following background facts for this claim, which the Court presumes to be true:

> During trial, the videos introduced into evidence were played in open court. The court instructed the jury that if it wished to see the videos again, it should send a note through the bailiff, and the videos would then be played in open court. Soon after the jury began deliberating, the court received a note asking to view the videos "privately (without audience) to discuss among ourselves." The court discussed the note with counsel, who agreed on the following procedure. Because the videos were playable only via a program on the prosecutor's laptop computer, which also contained files the jury was not entitled to see, the jury would watch the videos in open court. The court would suggest to the jurors that each video be played three times, would admonish them not to speak while viewing the videos and would tell them to write another note if they wished to view the videos again. The court informed the jurors of the procedure, and before the videos were played, received a note from the jury asking whether the videos would be played in real time, or if

3:15-cv-01882-H-KSC

they could be played in slow motion. The court responded the videos would be played in real time, and if the jurors wished to see the videos in slow motion, they should send another note.

At defense counsel's request, the court allowed the jury to gather around the screen to obtain a better view. The videos were played three times. The jury returned to the deliberation room, and a short time later sent the court a note asking to view the video taken outside the Hard Luck Tavern three times frame by frame and once in real time. The court responded that for technological reasons, the video could not be played frame by frame, so it would be played a couple of times at quarter speed and then a couple of times at half speed. The court told the jurors to make a note of any point they would like the video stopped, and the court would try to accommodate any request. The court admonished the jury not to hold any discussions in open court, then had the video played twice at quarter speed and twice at half speed. The court asked the jurors if they wished the video played again at quarter or half speed. The jurors did not ask to see the video again. The court told the jurors to send another note if they had further requests. After the jury left the courtroom, the court stated its belief that the video could not be played more slowly than quarter speed. The prosecutor agreed. Defense counsel did not comment.

The next morning, the jury sent the court a note asking to see the video "at [quarter] speed and [half] speed, three times." Defense counsel told the court that he and the prosecutor "would like to have the jurors review the videos as if they were in a private deliberative area." The court closed the courtroom and directed the jurors not to talk while the video was playing. The court told the jurors they were free to position themselves for the best view. The prosecutor played the video three times each at half speed and quarter speed. The court excused the jurors for further deliberations and asked them to send another note if they had another request.

A little more than one hour later, the court received a note from the jury asking to view the video after the lunch break, three times in real time, two times at half speed and once at quarter speed. After the lunch break, the court told the jurors to position themselves for the best view and admonished them to refrain from discussion. The video was played at the three speeds requested. The jury returned to the deliberation room. After deliberating for a period lasting between one and one-quarter hour and two hours 40 minutes, the jury notified the court it had reached a verdict.

(Doc. No. 16-13, Lodgment No. 5 at 11-14.)

Denying the claim, the Court of Appeal concluded that:

"[California Penal Code] Section 1137 . . . provides that the jurors, upon

retiring for deliberation, may take with them all papers which have been received into evidence (except depositions). Moreover, there is judicial authority that transcripts of tape-recorded testimony may be taken into the jury room." (*People v. Fajita* (1974) 43 Cal.App.3d 454, 473.) Nevertheless, "what may be taken by the jury into the jury room is left to the sound discretion of the trial court." (*People v. Walker* (1957) 150 Cal.App.2d 594, 603.)

Here, the court did everything possible to accommodate the jury's request to view the videos. The court allowed the jurors to position themselves so as to have a clear view, and to view the videos at various speeds, as many times as they wished. The only limits the court imposed were those required by technology and the extraneous material on the prosecutor's laptop that the jury was not entitled to see. There was no error.

(Doc. No. 16-13, Lodgment No. 5 at 14.)

The Court of Appeal's determination that there was no error in the video-viewing procedure was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. "[T]he criminal trial has one well-defined purpose—to provide a fair and reliable determination of guilt." Smith v. Phillips, 455 U.S. 209, 225 (1982) (citation omitted). "That purpose simply cannot be achieved if the jury's deliberations are tainted by bias or prejudice." Id. Indeed, "[f]airness and reliability are assured only if the verdict is based on calm, reasoned evaluation of the evidence presented at trial." Id.

Furthermore, "it is a 'cardinal principle that the deliberations of the jury shall remain private and secret' in order to protect the jury from improper outside influence." United States v. Evanston, 651 F.3d 1080, 1084 (9th Cir. 2011) (quoting United States v. Olano, 507 U.S. 725, 737 (1993)); see also Remmer v. United States, 350 U.S. 377, 382 (1956) ("[I]t is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made.").

At Petitioner's trial, within the court's technological limitations, the trial judge granted each of the jury's requests to view the video evidence. Having instructed the jury to not speak while watching the videos, the court granted the jury's multiple requests to watch the videos at full speed, one-half speed, and one-quarter speed—the slowest speed

possible on the prosecutor's laptop computer. (Doc. Nos. 16-8, 16-9, Lodgment No. 2 at RT 738-47, 851-54.) The court also stated that it would endeavor to accommodate any request to pause the video at particular points and told the jurors that they could freely position themselves in the courtroom to best view the video. (Id. at RT 741, 743.) The jury returned to the deliberation room following each viewing session. (See, e.g., id. at RT 742, 745.) There is no indication that, by following this viewing procedure, the court exerted "improper outside influence" on the jury's deliberations, Evanston, 651 F.3d at 1084, or tainted the jury's deliberations with bias or prejudice, Smith, 455 U.S. at 225. And even if this viewing procedure rose to the level of constitutional error, it did not have a "substantial and injurious" effect on the jury's verdict. See Davis, 135 S. Ct. at 2211 (citation omitted). As a result, the Court rejects Petitioner's claim on the merits.[9]

### 5. Access to Courts Claim

Finally, Petitioner asserts that he was denied access to the courts in violation of due process because the Superior Court denied his habeas petition as untimely. (Doc. No. 28 at 56.) The Superior Court concluded, specifically, that Petitioner "offers no explanation for his delay of over one year in bringing his petition, and also offers no explanation as to why the matters of which he now complains, if they had merit, were not raised in the trial court and/or in the Court of Appeal, where he was represented by new counsel." (Doc. No. 38-2, Lodgment No. 9 at 1-2.)

Petitioner raised this claim before the California Court of Appeal, which concluded that:

> Finally, this court does not address Gonzalez's challenge to the superior court's order denying the petition for writ of habeas corpus he filed in that court. That order is not appealable or otherwise reviewable by this court. (*In re Clark* (1993) 5 Cal.4th 750, 767, fn. 7; *In re Crow* (1971) 4 Cal.3d 613, 621, fn. 8.)

---

[9] The Respondent argues that, because this claim also challenges the trial court's discretion under state law to determine what the jury may take into the deliberation room, it is "[i]n essence" a question of state law and does not raise a federal question at all. (Doc. No. 15-1 at 13.) However, Petitioner does allege violations of his Sixth and Fourteenth Amendment Rights, which the Court addresses above.

(Doc. No. 38-4, Lodgment No. 11 at 3.)

Because no state-court decision furnishes a basis for the Court of Appeal's underlying reasoning, the Court conducts an independent review of the record to ascertain whether the state court's decision was objectively unreasonable. Castellanos, 766 F.3d at 1145; see also Richter, 562 U.S. at 98. The Court concludes that it was not. "[P]risoners have a constitutional right of access to the courts." Bounds v. Smith, 430 U.S. 817, 821 (1977). But to establish a violation of this right, Petitioner must show that the Superior Court's finding of procedural default caused actual injury to his claims. See Lewis v. Casey, 518 U.S. 343, 351-55 (1996) (holding that access to court claim requires showing of "actual injury" to plaintiff's non-frivolous legal claim caused by defendant's conduct). No such injury occurred here, as the Superior Court's denial of the petition as untimely did not impede Petitioner's right to file that petition or to appeal the denial to the Court of Appeal and the California Supreme Court. Accordingly, the Court denies this claim on the merits.

## III. Petitioner's Request for Evidentiary Hearing and Expansion of the Record

The Court has thoroughly considered Petitioner's request for an evidentiary hearing, (Doc. No. 50 at 3-4), and for expansion of the record, (Doc. Nos. 59, 57). Mindful of the Supreme Court's holding that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits, Pinholster, 563 U.S. at 181, and considering all of the arguments, the Court denies Petitioner's request.

## IV. Certificate of Appealability

A certificate of appealability may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court has denied the petitioner's constitutional claims on the merits, the petitioner satisfies the above requirement by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). The Court concludes that reasonable jurists would not find the Court's assessment of Petitioner's claims debatable or wrong. Accordingly, the Court

declines to issue a certificate of appealability.

## Conclusion

For the foregoing reasons, the Court denies Petitioner's amended petition for a writ of habeas corpus and adopts the magistrate judge's R&R. (Doc. Nos. 28, 30, 62.) Additionally, the Court denies Petitioner a certificate of appealability.

**IT IS SO ORDERED.**

DATED: January 23, 2018

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT